ECONOMY REFINING & SERVICE CO., INC.,
Plaintiff, Cross-defendant and Respondent, v.
ROYAL NATIONAL BANK OF NEW YORK, Defendant,
Cross-complainant and Appellant;
MICHAEL D. MARCUS, Cross-defendant and Respondent.

## COUNSEL

Cartwright, Saroyan, Martin & Sucherman and Robert E. Cartwright for Defendant, Cross-complainant and Appellant.

Stark, Stewart, Simon & Sparrowe, John F. Wells and Merrill J. Schwartz for Plaintiff, Cross-defendant and Respondent and for Cross-defendant and Respondent.

## OPINION

**DEVINE, P. J.**—Royal National Bank of New York appeals from a judgment which denies it as cross-complainant relief under its action against respondents on alleged fraudulent conveyances, and which quiets title in respondent Economy Refining & Service Co., Inc. (hereinafter, Economy) to the property allegedly fraudulently conveyed. The conveyances, to Michael D. Marcus, which purportedly became effective on July 30, 1965, were a quitclaim deed, a bill of sale, and certain assignments, all of which were made by Universal Petrochem Corporation (hereinafter, UPC). The conveyances completely stripped the corporation of its assets and made impossible the collection of a judgment which appellant bank had originally obtained in the State of New York, and later obtained by an action on the judgment* in California against UPC, and which was about to be recorded at the time of the effectuating of the conveyances.

The events leading to the transfers of July 30, 1965, may be narrated briefly. Marcus, an investment counselor, had obtained shares of stock of

---

*Throughout this opinion, we refer for convenience to the "judgment" in New York. Actually there were two judgments, one for $73,938 against UPC, and one for $5,344 against one of UPC's subsidiaries, Pacific Petroleum Company.

UPC in exchange for the release of judgments which he held against Irving Rill, majority stockholder of the company. The company was pressed for ready cash. Rill and Marcus discussed the subject of obtaining funds. Marcus was elected director of the company and chairman of the board, and chief executive officer at a meeting of stockholders in May 1964. Marcus agreed to attempt to raise at least $125,000. On May 5, 1964, UPC executed a loan agreement with Marcus on behalf of himself and undisclosed principals (the Marcus Group), for sums up to $200,000, to be secured by a deed of trust covering all of UPC's real property, a pledge of the stock of Port Petroleum Corporation (a wholly owned subsidiary of UPC), a chattel mortgage covering all of the tangible assets of UPC and Port, and an assignment of their intangible assets. The agreement provided for broad foreclosure rights, including the right to foreclose in the event the value of the collateral, in Marcus' opinion, became impaired, and the right to foreclose by public or private sale at which Marcus could purchase the property. A promissory note in the sum of $125,000 was issued to Marcus in connection with the loan agreement. The agreement also provided that if and when money over and above the initial $125,000 was received, UPC and Port would execute additional notes "payable to the order of persons designated by MICHAEL D. MARCUS, as the lenders of said sums."

Pursuant to the terms of the loan agreement, UPC executed and recorded a deed of trust on its real property, and chattel mortgages were executed and recorded by UPC and Port. UPC and Port each executed notices of intention to chattel mortgage and these were published in the newspaper in compliance with the Bulk Sales Act.

On June 20, 1964, the board of directors of UPC passed a motion authorizing Marcus "at any time within the next five years to convert the demand notes of the Company of approximately $125,000.00 to common stock of the Company, not to exceed book value of the Company as of April 30, 1964; subject to be adjusted downward on a per share basis on any assets later found to be worth less than their apparent worth on April 30, 1964." On October 19, 1964, a letter was sent by UPC to Marcus which provided for the following: "In the event of any judgment, lawsuits or other actions which may impair the operation of this company, we do hereby waive all notice and authorize you to take over all the assets of this company in lieu of foreclosure of your Chattel Mortgage and Deed of Trust."

Marcus obtained from friends and relatives various advances which by July 1965 amounted to $201,000. At the time of the transfer on July 30,

1965, the loans to the Marcus Group were subordinate to a loan of $250,000 which had been obtained from the Small Business Administration.

It is difficult to find what the net worth of UPC was on that date from financial statements. But Marcus testified that under no conditions could the corporation or its assets have been sold for enough to pay the outstanding mortgages; that he doubted that even the Small Business Administration debt could be paid; and that the only way to save any part of the Marcus Group investment was to transfer the business to a separate entity, keeping it running on the hope that the market would some day improve and the business would again have some value. We accept as true this testimony as that favorable to respondents. It was conceded, however, that the business made a profit in the year ending on June 30, 1965, and that profits of the business increased in later months of 1965 so that when Marcus was deposed in January 1966, he testified, the business had been "extremely profitable" during the last several months. The loans to Small Business Administration and to the Marcus Group were not in default.

When Marcus learned that appellant's judgment against UPC in New York, which had been obtained in 1964, had not been satisfied, as he had thought it was, and that it was to be recorded in California, and when he considered a wage claim of $30,000 held by a former employee, he proceeded to make transfers of all of the assets of UPC to himself for the Marcus Group. The deed of trust was ignored; instead, by what amounts to strict foreclosure, a quitclaim deed of UPC's real property to Marcus was executed by UPC by its vice president, Charles R. Nelson. It recites "consideration less than $100.00." The chattel mortgage was not foreclosed; a bill of sale and two assignments transferred to Marcus all of the assets other than the real property.

Marcus then proceeded to form a corporation and transfer all the assets formerly held by UPC to the new corporation, Economy Refining & Service Co., Inc. The transfer of assets from Marcus to Economy was accomplished on October 31, 1965. There were issued to Marcus (for the Marcus Group) 100,000 shares of Economy stock, subject to the approval of the Commissioner of Corporations. The business, which was that of collecting, refining and marketing of petroleum products, was carried on following July 30, 1965, the date of recording and effectuating of the conveyances, until September 30, 1965, by UPC. On September 30, 1965, the books of UPC were closed and on the next day, October 1, 1965, the books of Economy were opened. On these books there appeared the assets formerly

held by UPC and as liabilities the debts due to the Marcus Group and to certain other trade creditors. The debt to Royal National Bank and to one other set of creditors (who appealed but whose appeal was dismissed for failure to pay the filing fee) did not appear as liabilities on Economy's books. The business theretofore operated by UPC was carried on by Economy in the same place and manner as before, except that Marcus gave "a lot more time" to it. As stated above, it was operated profitably immediately, and it continued to be so operated to the time of trial.

The stockholders of UPC, Marcus testified, were "automatically wiped out." Throughout the testimony at the trial, Mr. Marcus shows that following the delivery to him from UPC of the various documents in 1964, he virtually alone decided on the course of events of the two companies. Appellant bank, by its cross-complaint to Economy's quiet title action, sought to have liability for its judgment imposed on the new corporation.

The trial judge made these findings: "1. The transfers by Universal Petrochem Corporation to Michael D. Marcus on or about July 30, 1965, were made without any actual intent to hinder, delay or defraud the creditors of Universal Petrochem Corporation. 2. The transfers by Universal Petrochem Corporation to Michael D. Marcus on or about July 30, 1965, (a) left Universal Petrochem insolvent, and (b) were made for a fair consideration." Acting upon these findings, the court quieted title in Economy to the transferred property as against appellant and other defendants.

It is our holding that the transfer of assets from UPC to Economy by the conveyances to and from Marcus are a fraud upon appellant creditor; that the requisite intent to defraud is demonstrated by admission in the testimony of Mr. Marcus; and that UPC received no consideration for the transfer.

 Transfers of all of the assets of a person or corporation in straitened circumstances, without fair consideration, to a corporation having substantially the same ownership, by which the just claims of creditors are defeated, are of such fraudulent nature that the new corporation may be held to the debt of the old. (*Stanford Hotel Co.* v. *M. Schwind Company,* 180 Cal. 348 [181 P. 780]; *Atkinson* v. *Western Development Syndicate,* 170 Cal. 503 [150 P. 360]; *Talbot* v. *Fresno-Pacific Corp.,* 181 Cal.App.2d 425 [5 Cal.Rptr. 361]; *Pringle* v. *Hunsicker,* 154 Cal.App.2d 789 [316 P.2d 742]; *Thomson* v. *L. C. Roney & Co.,* 112 Cal.App.2d 420 [246 P.2d 1017]; *Blank* v. *Olcovich Shoe Corp.,* 20 Cal.App.2d 456

[67 P.2d 376]; *Malone* v. *Red Top Cab Co.,* 16 Cal.App.2d 268 [60 P.2d 543]; 15A Fletcher, Cyc. Corporations, § 7412, pp. 124-130.)

■ Respondents argue that the rule stated in the authorities cited above applies only when the ownership of transferor and transferee is the same and that there are different owners in the present case. Although, strictly speaking, there are no ascertainable owners of Economy because the Commissioner of Corporations is holding the matter in abeyance pending the decision in this case, according to the plan testified to by Marcus the shareholders will be the members of the Marcus Group who will have converted their promissory notes, issued by UPC, to stock of Economy. They will also receive shares of Economy stock in exchange for the assets formerly held by UPC but now held by Marcus, which he will transfer to Economy. The remaining shareholders of Economy will be certain directors and employees of UPC who had been voted stock in UPC and who had agreed to waive their rights to UPC stock in consideration of receiving stock in Economy at some future date.

Justice requires the conclusion that the ownership of the two corporations is identical for purposes of this lawsuit. It must be remembered that this action is not only one in which, by cross-complaint, Royal National Bank is seeking to hold the new corporation responsible for the debt, but is also one in which Economy is asking a court of equity to quiet title to the transferred assets, including the real property. Bearing this in mind, we point out that had the Marcus Group converted their notes to stock of UPC, their position would have been subordinate to that of other creditors. Now that the assets have purportedly been transferred from UPC and, according to respondents' theory, Royal National Bank has been eliminated as a creditor except as against the ghost of UPC, the Marcus Group would, if the Commissioner of Corporations approves, become the owners of Economy. They had convertible notes before the exchange; under their theory they have convertible rights now. To be sure, the stockholders of UPC have been, according to Mr. Marcus' testimony, "automatically wiped out." But we think it is impossible that the decision of one man, who was chief executive and chairman of the board of directors of UPC, and who was also the holder of creditors' claims, can be held to have changed the ownership of the assets insofar as the claims of other creditors are concerned. Respondents say that Royal National Bank as a creditor has no standing to challenge the obliteration of whatever was the equity of the stockholders of UPC. It is not a question of standing; it is a matter of the creditors' right to show that the ownership ought to be regarded as continuing.

■ We come next to the subject of consideration. What did UPC receive in return for the transfer of all of its assets? Nothing. UPC still exists as a corporation. It was not dissolved by the statutory process. If it had been, its assets would have been subject to the claims of creditors. (*Trubowitch* v. *Riverbank Canning Co.,* 30 Cal.2d 335, 345 [182 P.2d 182].) In fact, UPC had the vitality to prosecute a cause of action against certain parties named White and Rivers as late as 1966. Mr. Marcus testified during that trial and did not volunteer the information that UPC had no assets at all. Nowhere in respondents' brief do we find an express statement of what the purported consideration was. It appears, however, that respondents' theory is that UPC owed more at the time of the transfer than it could have produced by sale of its assets and that, therefore, the withholding of foreclosure is tantamount to consideration. But the notes of the Marcus Group were not cancelled. Presumably, if UPC had won the lawsuit against White and Rivers, the proceeds would have been subject to the indebtedness on the unpaid notes held by the Marcus Group. But besides the fact that UPC still has a legal existence, and besides the fact that the Marcus Group still holds UPC's notes, there is the matter of strict foreclosure. Not only was the decision of making the transfer left to Marcus, but also it was left to him to select any moment of time when he judged the collateral to be impaired. The law of this state forbids strict foreclosure of real estate security. (Cal. Real Estate Secured Transactions (Cont.Ed.Bar) § 3.76, pp. 124-125.)

Respondents cite Civil Code section 3439.03, which reads: "Fair consideration is given for property . . .: (a) When in exchange for such property . . . as a fair equivalent therefor, and in good faith . . . an antecedent debt is satisfied." But this is not helpful to respondents because the antecedent debt was *not* satisfied. If it were satisfied, the notes would have been cancelled. If they had been cancelled, on what theory would the holders of dead notes be entitled to have their claims carried as liabilities of the new corporation?

■ We come now to the subject of intent. The trial judge found that the transfer was made without any actual intent to hinder or defraud the creditors of UPC. The kind of case which is before us presents an unusual, if not unique, aspect of intent. In order to constitute intent to defraud, it is not necessary that the transferor act maliciously with the desire of causing harm to one or more creditors. The transferor may sincerely regret that he acts as he does. Mr. Marcus testified that his decision was difficult and he knew that he was hurting Royal National Bank by his action. Surely, however, he preferred to take care of claims of the persons from whom he had solicited funds. If this were merely a preference among

creditors, it would be sustainable. (*Priest* v. *Brown,* 100 Cal. 626 [35 P. 323].) But where allowable preference is exercised, the debt of the pre-ferred creditors is extinguished or diminished, depending upon the amount of payment and the agreement of the parties. Under the circumstances of this case, as related above, we conclude that actual intent to defraud consisted of the intent to do just what was done, that is, to remove the assets and to make impossible the collection of appellant's judgment while retaining intact the claims of the Marcus Group. The fact, therefore, that the trial judge evidently believed that Mr. Marcus was not actuated by an evil motive is not sufficient to remove the fact that what he intended to do was objectively wrong and fraudulent.

Respondents also contend that there was no harm to appellant because had there been a foreclosure on the secured creditors' claims, there would have been nothing left for appellant. But the answer to this is the one given above in another aspect. The fact that the financial status was so at the particular time when the transfers were made is not enough to justify the transfers. The foreclosure statutes and those relating to sales under deed of trust show recognition of the fact that there may be recovery from depressed circumstances so that a reasonable time must be permitted, and in addition, the opportunity for competitive bidding. Moreover, the fact that Royal National Bank was about to cause its judgment to be recorded in California in 1965 does not mean that the bank would be able to exe-cute at once or that it would have wished to do so. As a matter of fact, when the bank brought action against UPC on the New York judgment in the Superior Court in Alameda County, UPC defended the action. No mention was made during the trial of the fact that UPC's assets had been transferred. This defense shows, as does the action referred to above by UPC against White and Rivers, that the old corporation was not only in existence but was active for such purposes as suited its management. Royal National Bank did not obtain judgment in California on its New York judgment until 1967.

Finally, we note distinctions between the cases cited by respondents, *Atkinson* v. *Western Development Syndicate, supra,* 170 Cal. 503, and *Pringle* v. *Hunsicker, supra,* 154 Cal.App.2d 789, and the one before us. In each of these cases, the principles which have governed our disposition of the case are announced, but the transfer was held by the trial court to be nonfraudulent and the holding was affirmed on appeal. But in *Atkinson,* the indebtedness of the old corporation was completely satisfied, which, of course, was not so here. Besides, the grantor had retained sub-stantial assets which probably would be available to the creditors. There was also substantial consideration. In the *Pringle* case, the notes were can-

celled, the grantor retained substantial assets, and a large amount of new money was invested by persons not previously connected with the business at the time of the transfer.

The judgment is reversed, with directions to the trial court 1) to render judgment denying to plaintiff Economy Refining & Service Co., Inc. the quieting of title against Royal National Bank of New York; 2) to render judgment against Economy Refining & Service Co., Inc. on the cross-complaint of Royal National Bank of New York in the amount of the judgment obtained by the bank in California against Universal Petrochem Corporation, and in the amount of the judgment obtained by the bank in California against Pacific Petroleum Company, together with interest from the date of entry of the California judgments and costs; 3) to decide whether creditors formerly holding secured claims- against Universal Petrochem Corporation are entitled to priority against judgment directed to be rendered in favor of Royal National Bank of New York; and 4) to decide whether judgment should be rendered against Michael D. Marcus as trustee for creditors to the extent that he may hold assets transferred to him by Universal Petrochem Corporation. The trial court may, in its discretion, take additional evidence for the purpose of deciding the two issues numbered 3 and 4 in this judgment.

Rattigan, J., and Christian, J., concurred.

A petition for a rehearing was denied November 4, 1971, and the judgment was modified to read as printed above. Respondents' petition for a hearing by the Supreme Court was denied December 29, 1971.