Filed 11/8/22 Los Angeles Federal Credit Union v. Ahmad CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LOS ANGELES FEDERAL CREDIT UNION,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>TANVIR M. AHMAD et al.,<br><br>    Defendants and Respondents. | B317230<br><br>Los Angeles County<br>Super. Ct. No. 18TRCV00201 |

    APPEAL from a judgment of the Superior Court of Los Angeles County, Deirdre Hill, Judge. Affirmed.

    Anaya Law Group, Alana B. Anaya and Joseph P. Graziano for Plaintiff and Appellant.

    Yates Litigation and John R. Yates for Defendants and Respondents.

_____

The trial court found brothers Tanvir and Wasim Ahmad (the Ahmads) not liable for a judgment entered against their deceased father, Chaudhry Muhammad. In a previous action, Los Angeles Federal Credit Union (LAFCU) had obtained a judgment in its favor against Muhammad for debts he owed on loan and credit card agreements with LAFCU. Muhammad died before paying the judgment. LACFU then tried to enforce the judgment against the brothers by alleging they had fraudulently conspired with Muhammad to transfer his assets to themselves.

LAFCU contends the trial court erred in requiring it to show malice and direct intent to defraud in order to collect from the Ahmads on their father's judgment. It also argues the evidence is insufficient to support the finding that the Ahmads had no actual intent to hinder, delay or defraud LAFCU. We affirm the judgment.

**BACKGROUND**

In late 2016, Muhammad, who was in his late 80's, became seriously ill with an infection and was hospitalized for two to three weeks, 10 days of which were in an intensive care unit. Soon after his recovery, in March 2017, after stating that his health was not good, Muhammad gave the Ahmads $229,000 from a revocable trust for their use and the use of their children. This left no money in the trust account. Muhammad also transferred three pieces of real property which he owned into an irrevocable trust, with the Ahmads as co-trustees. The Ahmads were not present when Muhammad met with the lawyer to create

2

the irrevocable trust and they had no input into its terms.[1] After these transfers were complete, Muhammad was left with a monthly income of $5,780 from Social Security and his City of Los Angeles pension. Muhammad had lived on this income for at least 10 years. The transfers of the real estate to the trust increased the amount of disposable income available to Muhammad, as the yearly costs of the two rental properties exceeded their rental income.

Around 2016, Muhammad hired Tina Hao to be his caregiver. He initially paid her $2,000 a month. At some point, he married her. Between January 2016 and Muhammad's death in February 2020, Hao obtained $138,000 from Muhammad, about $42,000 more than she would have received at her initial rate of pay of $2,000 per month. Forty-four thousand dollars of the total was received in the last year of Muhammad's life. Some of this money was transferred by check, some by cash back from credit card transactions. Some of the checks did not appear to be in Muhammad 's handwriting.

In June 2016, Muhammad obtained a personal loan from LAFCU with an initial balance of $4,800 on which he made payments. He also had a credit card through LAFCU which had a small credit balance on it. In April 2017, he took a cash advance of $7,000 on the credit card. By March 2018,

---

[1] The value of these three properties is not clear from the record on appeal. Two were rental properties and the expenses of the properties exceeded the rental income. Two of the three properties had mortgages. One of the mortgaged properties was sold after Muhammad's death for less than $400,000, but there is no information about the amount of the mortgage.

Muhammad had taken out about $15,000 more in cash advances, and incurred charges of about $10,000, for a total debt of about $32,000.

In March 2018, Muhammad stopped making payments to LAFCU on his personal loan. In August 2018, he stopped making payments on his LAFCU credit card account. He continued paying on an auto loan and other credit cards until his death in February 2020.

LAFCU sued Muhammad on his overdue credit card account and in March 2019 obtained a default judgment in the amount of $37,258.05. LAFCU subsequently brought this action to enforce the judgment against the Ahmads pursuant to the Uniform Voidable Transfers Act, specifically Civil Code section 3439.04.[2] The matter was tried by the court, which found in favor of the Ahmads.

## DISCUSSION

Section 3439.04, subdivision (a), provides: "A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows: [¶] (1) With actual intent to hinder, delay, or defraud any creditor of the debtor." Subdivision (b) provides a list of factors which may be considered in determining actual intent under subdivision (a)(1).

---

[2]    Further undesignated statutory references are to the Civil Code.

4

Under section 3439.04, subdivision (a)(1), appellant was required to prove: 1) it had a right to payment from Muhammad; 2) Muhammad transferred property to his sons; 3) Muhammad transferred the property with the intent to hinder, delay, or defraud appellant; 4) appellant was harmed; and 5) Muhammad's conduct was a substantial factor in causing appellant's harm. (CACI No. 4200.) To prove intent to hinder, delay, or defraud creditors, it is not necessary to show that Muhammad had a desire to harm appellant. Appellant need only show that Muhammad intended to remove or conceal assets to make it more difficult for appellant to collect payment. (*Ibid*.)

At the conclusion of the bench trial, after considering several factors, including those listed in section 3439.04, subdivision (b), the court found there was "insufficient finding of actual intent to hinder, delay or defraud creditors. The judgment is for the defense."

A. *The Trial Court Correctly Found LAFCU Was Required to Show Muhammad Had an Actual Intent to Defraud It.*

LAFCU contends the trial court erred in finding that LAFCU had to show Muhammad acted maliciously and had a "direct" intent to defraud a creditor. LAFCU sometimes uses "direct intent" to mean malicious intent and at other times uses it in the phrase "direct intent to defraud." The trial court did not use the terms malice or maliciously and did not state that LAFCU had failed to prove "direct" intent (or to provide direct evidence of intent). Thus, it is far from clear what LAFCU means by "maliciously" and "direct" intent when applied to the trial court's actual findings. Because the trial court did not consider the concept of "malice" in making its findings, we find a further discussion of malice irrelevant.

We discern LAFCU contends the phrase "actual intent to . . . defraud" in section 3439.04, subdivision (a)(1), means only a sole intent to transfer assets, as long as that transfer results, whether intentionally or not, in a creditor being unable to reach those assets. LAFCU relies on *Economy Refining & Service Co. v. Royal Nat. Bank of New York* (1971) 20 Cal.App.3d 434 (*Economy Refining*) to support its interpretation of the term "actual intent to defraud." We are not persuaded. Indeed, we find *Economy Refining* supports the analysis of the trial court.

As the appellate court in *Economy Refining* cautioned before discussing the issue of intent, "The kind of case which is before us presents an unusual, if not unique, aspect of intent." (*Economy Refining*, *supra*, 20 Cal.App.3d at p. 441.) Significantly, the transferor in *Economy Refining* admitted he made the transfer to avoid the debt. As the court put it, "the requisite intent to defraud is demonstrated by admission in the testimony of Mr. Marcus." (*Id.* at p. 439.) "Mr. Marcus testified that his decision was difficult and he knew that he was hurting Royal National Bank by his action." (*Id.* at p. 441.)

In finding this admission showed the requisite intent, the court of appeal explained: "Under the circumstances of this case, as related above, we conclude that actual intent to defraud consisted of the intent to do just what was done, that is, to remove the assets <u>and</u> *to make impossible the collection of appellant's judgment* . . . . The fact, therefore, that the trial judge evidently believed that Mr. Marcus was not actuated by an evil motive is not sufficient to remove the fact that what he intended to do was objectively wrong and fraudulent." (*Economy Refining*, *supra*, 20 Cal.App.3d at p. 442, italics and underscoring added.) We understand the court of appeal's statement to indicate that

6

two intents are required: 1) an intent to transfer the assets; and 2) an intent "to make impossible the collection of appellant's judgment." This second intent is actual intent to hinder, delay or defraud the creditor.

Our conclusion that there must be an intent to transfer *and* an intent to hinder, delay, or defraud the creditor (as opposed to a consequential and unintended disadvantage to the creditor) is reinforced by the court of appeal's discussion of Marcus's "defense," which was that he transferred the assets to satisfy other creditors. The court of appeal acknowledged that a creditor preference could be a proper use of transferred assets, that is, some transfers are permissible even when they make one creditor's collection impossible. The court pointed out that Marcus did not in fact satisfy any other creditors with the transferred assets. Instead, he simply protected his own personal creditor claims by transferring reachable assets to another corporation. The court looked not merely at what Marcus did (transfer the assets), but also his reasons for doing it. "Malice", which the court defined as to act with "evil motive" or "the desire of causing harm" was not a part of the equation in proving "actual intent to defraud." (*Economy Refining*, *supra*, 20 Cal.App.3d at pp. 441–442.)

We note it is far from clear that the court of appeal in *Economy Refining* was relying on any provision of the former Uniform Fraudulent Conveyance Act (now Uniform Voidable Transfer Act) (Act). The court of appeal did not cite to that Act and appeared to rely on the common law rule that "[t]ransfers of all of the assets of a person or corporation in straitened circumstances, without fair consideration, to a corporation having substantially the same ownership, by which the just claims of

7

creditors are defeated, are of such fraudulent nature that the new corporation may be held to the debt of the old." (*Economy Refining, supra*, 20 Cal.App.3d at p. 439.)[3]

B.    *There Is Substantial Evidence to Support the Judgment in Favor of the Ahmads.*

LAFCU contends that the judgment in favor of the Ahmads was not supported by substantial evidence.

In assessing a claim of insufficiency of the evidence, we "must view the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court. [Citation.] We may not substitute our view of the correct findings for those of the trial court; rather we must accept any reasonable interpretation of the evidence which supports the trial court's decision." (*Filip v. Bucurenciu* (2005) 129 Cal.App.4th 825, 833 (*Filip*).) The evidence must be "reasonable in nature, credible, and of solid value." (*Ibid.*) We do not, however, reweigh the evidence. (*Flores v. Liu* (2021) 60 Cal.App.5th 278, 296 (*Flores*).)

---

[3]    The only reference to that Act was to section 3439.03, which defines "value" and is not relevant here. (*Economy Refining, supra*, 20 Cal.App.3d at p. 441.) The trial court used the phrase "actual intent to hinder, delay or defraud the creditors," (similar to language found in current section 3439.04) and the court of appeal discussed the trial court's findings on actual intent, but it also used language consistent with current section 3439.05), which do not require an actual intent to defraud.

8

Specifically, with regard to actions brought pursuant to section 3439.04, "[t]here is no minimum number of factors that must be present before the scales tip in favor of finding of actual intent to defraud. This list of factors is meant to provide guidance to the trial court, not compel a finding one way or the other." (*Filip, supra,* 129 Cal.App.4th at p. 834.) The trial court is not limited to the specific factors listed in section 3439.04 subdivision (b). (See *Lyons v. Security Pacific Nat. Bank* (1995) 40 Cal.App.4th 1001, 1021, fn. 3.)

"Where, as here, it is the *plaintiff* asserting on appeal that a *defense* verdict is not supported by the evidence, it is the plaintiff's burden to show on appeal that there is *no* substantial evidence to support that defense verdict, and not merely that substantial evidence would have supported a verdict in her favor." (*Flores, supra,* 60 Cal.App.5th at p. 297.)

Here, the trial court made several factual findings which support a defense verdict. The court found: 1) At the time of the transfers Muhammad had only a modest debt in the form of a personal loan on which he had been making regular payments; 2) Muhammad continued to make payments to LAFCU for at least a year after the transfer of his assets; 3) There was an innocent explanation for transfers: Muhammad believed his health was bad and he wanted to give the money to his sons while he still alive; 4) The Ahmads had no knowledge of Muhammad's financial situation and did not influence the creation of the irrevocable trust; 5) Muhammad had income sufficient to pay his living expenses and make payments on his debts as he had been living on his pension and social security for quite some time; 6) The transfer of the real property increased rather than diminished Muhammad's cash flow; 7) Muhammad's

9

cash flow was diminished by unauthorized transactions by his wife.

There is substantial evidence for the first two findings in the testimony of LAFCU's own witnesses and for the next four findings in the form of testimony by the Ahmads. As for the seventh finding, concerning the caregiver/wife, the court relied in part on financial documents and in part on the Ahmads' testimony about those documents. The court clearly found the Ahmads credible, and we may not substitute our assessment of credibility for that of the trial court. Further, LAFCU did not offer any evidence contradicting the Ahmads' testimony.

These findings support a conclusion that Muhammad transferred his assets either due to his failing health and a desire to give his money to his children while he was still alive or to protect the assets from his caregiver/wife. The trial court was permitted to infer from its factual findings that Muhammad was not motivated by any effort to hinder creditors. Substantial evidence supports the verdict in favor of respondents.

C.     *There Is No Evidence the Trial Court Misunderstood the Concept of Insolvency.*

Finally, LAFCU contends the trial court misunderstood the concept of insolvency, and this misunderstanding was prejudicial.[4] LAFCU points to the trial court's statement that the "contention that [Muhammad] had nothing is not accurate. He had a pension and . . . social security coming in. He was making

---

4       Subdivision (b)(9) of section 3439.04 lists a debtor's insolvency as a factor which may be considered in determining intent.

10

payments on certain bills, certain bills he was not, over periods of time."

In context, this statement is a response to LAFCU's closing argument. In closing argument, LAFCU contended that after the transfers Muhammad became insolvent and had "no money left" and that was why he took cash advances, and "when he died he only had a little over $800 to his name."

The Ahmads responded by acknowledging that after the transfers Muhammad was technically insolvent because his pension and social security were not collectible by creditors, but they argued this factor was not significant as a practical matter because Muhammad had a substantial income and voluntarily used that income to make payments to his creditors.

The trial court's statement after closing argument is most reasonably understood as a response to LAFCU's argument that Muhammad had "no money" after the transfer and thus needed to take the cash advances. This was quite literally untrue, as the trial court was pointing out. It does not show that the trial court failed to understand the concept of insolvency. Nor did it show that the trial court did not agree that Muhammad was technically insolvent, a situation which the Ahmads expressly conceded.

## DISPOSITION

The judgment is affirmed.  Respondents are awarded costs on appeal.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


STRATTON, P. J.

We concur:


WILEY, J.


HARUTUNIAN, J.*

---

\*     Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.