[No. 3197–2.   Division Two.   December 21, 1979.]

DAVID BLOCK, ET AL, *Respondents*, v. OLYMPIC HEALTH SPA, INC., ET AL, *Appellants*.

*Douglas W. Purcell,* for appellants.

*Herbert Gelman* and *Gelman & Couture,* for respondents.

REED, J.—Defendants Olympic Health Spa, Inc. (Olympic), and Thom Lane & Associates (Lane) appeal from portions of a Pierce County Superior Court judgment which awarded plaintiffs David Block and M. Block (Blocks) damages arising out of a breach of a lease and for conversion. We affirm the judgment against Olympic and reverse that part of the judgment against Lane based on a breach of lease.

On March 30, 1973, Olympic leased premises in Tacoma from Western Discount Corporation and commenced operating thereon a health spa facility. Paragraph 24 of the lease agreement provided as follows:

> ASSIGNMENT OR SUBLETTING. Lessee shall not assign this lease nor any interest herein and and shall not let or sublet the whole or any portion of said premises without the written consent of Lessor to do so, nor shall this lease or any interest herein be assignable or transferable from Lessee by operation of law. Any transfer of this lease or any interest herein from Lessee by way of merger, consolidation or liquidation of Lessee or *any change in the ownership of or the power to vote the majority of the outstanding voting stock of Lessee (other than as a*

*result of stock transfers by means of gift, bequest or inheritance) shall constitute an assignment for the purposes of this paragraph.* No assignment of this lease nor of any interest herein and no letting or subletting of said premises shall affect or diminish the liabilities, duties and obligations of Lessee hereunder, and if Lessor should once give consent to such assignment or such letting or subletting Lessor shall not be barred from afterward refusing to consent to any further assignment, letting or subletting by Lessee.

(Italics ours.)

In August 1974, Blocks purchased the building and took an assignment of the Olympic lease from Western Discount Corporation. Although Blocks knew that Olympic was having financial difficulties and had undergone a bankruptcy reorganization, little or no inquiry was made about the company or its stockholders.

In February 1974, apparently unbeknownst to Blocks, Lane had entered into an agreement with the 7 stockholders of Olympic to purchase all of their capital stock, consisting of the 70 shares outstanding of the 500 shares authorized by the company's charter. The agreement provided that Lane was to pay $7,000 (par value) for the stock, which was to be placed in escrow. The agreement further provided that Olympic—a party to the agreement—would pay into escrow for the stockholders over a certain period of time the sum of $69,000, allocated $20,000 to "compensation" and $49,000 to payment of certain notes of various classifications. Although the stock was to remain in escrow until full performance of the agreement, Lane was vested with interim management powers until he could obtain the lessor's consent to his stock purchase pursuant to paragraph 24. This consent was obtained from Blocks in November 1974; the stockholders then gave Lane irrevocable stock proxies, constituted him president of the corporation and resigned as officers and directors. Lane, who at all times conducted a separate real estate business on Vashon Island, hired a full–time manager for the day–to–day operation of the health facility.

Because Olympic was in serious financial straits and needed funds for operating expenses and to meet its contract obligations to its stockholders, Lane loaned the company approximately $50,000 in exchange for corporate notes. In addition, Lane personally guaranteed bank loans of $60,000. These "infused" funds were commingled with other corporate income and used by Olympic to carry on business as usual; at some point the corporation paid $13,000 into the escrow pursuant to the agreement with the stockholders.

On July 10, 1975, Lane arranged to sell Olympic's assets, consisting of accounts receivable and equipment, to U.S.C.C., Inc. (USCC). At the time of sale, Lane estimated the value of corporate assets, including undiscounted accounts receivable, at $135,000. As consideration, USCC agreed to assume the Blocks' lease, assume Olympic's bank loan of $60,000 and pay $35,000 cash represented by a promissory note. Simultaneously with the sale to USCC, Lane, as president "pro tem" of Olympic, assigned the $35,000 note to himself. Thereafter, Lane used approximately $10,000 from the sale proceeds to pay Olympic's creditors and paid himself the balance of $25,000 in full satisfaction of his $50,000 loan. For all practical purposes the transaction left Olympic a hollow shell without assets.

Lane then sought Blocks' consent to an assignment of the lease to USCC; Blocks, however, refused because of USCC's apparent shaky financial condition. Nevertheless, Blocks began accepting rents from USCC and continued doing so for a period of 18 months. Finally in November 1976, USCC defaulted on the lease and abandoned the premises, leaving them subject to unpaid taxes, insurance and utilities. Thereafter Lane and Blocks attempted to negotiate an assignment of the lease to First Charter Corporation, another of Lane's companies. During these negotiations Lane advised Blocks that Olympic no longer existed. The negotiations failed and at some point Lane entered the leased premises and surreptitiously removed certain items of personal property.

Blocks brought suit against Olympic, Lane, USCC and others to recover damages for breach of the lease and for Lane's conversion of personal property. A trial to the court resulted in judgment against all defendants on the lease and against Lane for conversion. Blocks were awarded attorney fees against both defendants. Only Olympic and Lane appeal.

Olympic's appeal challenges only the trial court's refusal to credit a $5,900 security deposit on the judgment. Lane's appeal questions whether he may properly be held personally liable on the lease, either because (1) his purchase of Olympic's stock constituted an assumption of the lease, or (2) his activities mandated a piercing of the corporate veil. He does not contest the conversion award. We affirm the judgment as to Olympic and reverse as to Lane.

### THE SECURITY DEPOSIT

At the time of trial Blocks held $5,900 which had been deposited by Olympic in accordance with paragraph 4 of the lease, which reads in part as follows:

> *DEPOSIT. As partial consideration* for execution of this lease, Lessee shall pay to Lessor a deposit of Two Thousand Seven Hundred ($2,700.00) Dollars upon execution hereof. If Lessee shall have fully complied with all of the covenants, terms and provisions of this lease, *but not otherwise,* the amount of said deposit shall be credited upon the rental due for the last three months of the lease term;

(Italics ours.) The trial court gave Blocks judgment for all rentals due and unpaid at the time of trial, plus all rentals as they came due during the lease term ending March 31, 1978,[1] but refused to credit the deposit on the judgment. Olympic argues that if Blocks are permitted both to collect the judgment in full and retain a deposit securing full performance, a double payment will result. Put another way, collection of the judgment fulfills the lease just as much as

---

[1]Apparently a supplemental judgment was entered on August 10, 1978, to reflect those rentals which came due after date of the original judgment.

if Olympic had faithfully paid for each month of the term. We do not agree. The plain language of the lease is that the cash deposit is "partial consideration" for the term, *i.e.*, additional rent, with a proviso that lessee's faithful performance will be rewarded by application of the deposit to the last 3 months and "not otherwise." The lease having been breached, the trial court correctly refused credit for the deposit.[2]

## THE ASSIGNMENT CLAUSE

We need not answer the major thrust of Lane's challenge concerning interpretation of paragraph 24. After a careful examination of the trial court's oral opinion, findings of fact, and conclusions of law, we conclude the judge did not hold that Lane's stock purchase also constituted a personal assumption of the lessee's obligations. Rather, the judge based his decision to hold Lane responsible solely on his conclusion that he was not protected by Olympic's corporate veil. In the trial court's own words:

> It is a good question whether this alone [paragraph 24] would impose liability on the Lanes ,for the rent under this lease. *Without studying the lease with great care, I cannot say.* But there is a reasonable argument that can be made, and it has been asserted here, that that alone might impose such liability. In any event, *it is not necessary to resolve that* because everything I have seen here would indicate to me that Mr. and Mrs. Lane used this corporation as their alter ego, disregarding the corporate status, wheeling and dealing, manipulating with its assets, and ultimately scalping the corporation, leaving it an empty shell for the plaintiffs herein and to plaintiffs' detriment.

(Italics ours.)

---

[2]In any event, according to Lane's testimony Olympic Health Spa, Inc., was reimbursed by U.S.C.C., Inc., for the $5,900 deposit when the latter assumed the lease. Thus we fail to see how Olympic was damaged. As noted, USCC has not appealed.

### PIERCING THE CORPORATE VEIL

■ This brings us to the principal issue on appeal, which is whether Lane so conducted himself that the corporate entity of Olympic must be disregarded, thus rendering Lane personally liable to Blocks on the lease. Of course, the mere fact that Lane was or would become the sole stockholder of Olympic is not enough to justify disregarding the corporate entity. *Grayson v. Nordic Constr. Co.,* 22 Wn. App. 143, 589 P.2d 283 (1978); *see also Nursing Home Bldg. Corp. v. DeHart,* 13 Wn. App. 489, 495, 535 P.2d 137 (1975) and *State v. Northwest Magnesite Co.,* 28 Wn.2d 1, 41, 182 P.2d 643 (1947). The existence of the corporation separate and apart from its stockholders, officers and directors will be respected in the absence of exceptional situations where, in order to prevent fraud or manifest injustice, the corporate veil will be pushed aside. *Frigidaire Sales Corp. v. Union Properties, Inc.,* 88 Wn.2d 400, 562 P.2d 244 (1977); *Grayson v. Nordic Constr. Co., supra.*

In holding that the corporate entity of Olympic afforded Lane no insulation from personal liability, the trial court was obviously impressed by the use of Olympic's funds to purchase Olympic stock for Lane's account. It is true the corporation paid $13,000 into escrow for application to the purchase price owed the stockholders, but it does not follow that Lane was improperly benefited thereby, nor that corporate creditors such as Blocks were prejudiced in any way.[3]

It will be recalled that Lane agreed to pay $7,000 for the stock at a time when the corporation was in serious financial straits; he also assumed personal responsibility for corporate debts during the period of his interim operation, *i.e.,*

---

[3]Because the agreement of Olympic Health Spa, Inc., to pay the stockholders was not attacked on any other ground below, we can only assume their claims for "compensation" and a return of their capital contributions were legitimate. In this respect, their claims were no different from other debts owed by Olympic at the time of Lane's takeover. Lane did not control the corporation when it became a signatory to the contract.

until he could get the lessor's approval for his stock purchase. Although the stockholders wished additional payment in the way of "compensation" and to recoup their capital and other contributions to the corporation, Lane did not wish to assume these debts personally. He was, however, willing for the corporation to make these payments as and if it could. Of course the corporation's ability to do so depended upon Lane's management of its affairs. It should make no difference that, if the corporation met all of its obligations under the agreement with the stockholders, Lane would receive the stock from escrow. As the corporation's sole stockholder Lane necessarily would benefit from any payment of corporate debts. The result, insofar as unsecured creditors such as Blocks are concerned, is the same as if the corporation had received the stock and retired it to its treasury.

The trial court also attached considerable significance to Lane's failure to comply with the "laws of this state governing the internal operation of a corporation." This conclusion apparently derives from (1) Lane's use of his Vashon Island business stationery for corporate correspondence on several occasions; and (2) Lane's failure to hold corporate meetings and adopt formal resolutions for the transaction of business. However, the record shows that Lane attempted to keep his personal affairs separate from those of the corporation. His personal loans of approximately $50,000 were represented by Olympic's promissory notes, signed by him and Mrs. Lane as president and secretary. The corporation maintained its own bank accounts, keeping its funds separate from Lane's personal funds.

Certainly at no time were Blocks misled by any confusion or intermingling of Lane's personal affairs with those of the corporation. *Frigidaire Sales Corp. v. Union Properties, Inc., supra.* Olympic was the lessee when Blocks purchased the property and at that time Blocks knew nothing of Lane's arrangement to acquire Olympic's capital stock from its shareholders. Informality of operation is permitted in the case of close or family–owned corporations. 2 W.

Fletcher, *Cyclopedia Private Corporations* § 394.1 (rev. ed. 1969); 2 F. O'Neal & G. Payne, *Close Corporations* §§ 8.04, 8.08 (1971). In any event, none of Lane's informal actions could reasonably have led Blocks to believe they were dealing with Lane rather than the original lessee, Olympic. Consequently they have shown no prejudice because of the informal manner in which Lane sometimes managed corporate affairs.

Blocks next claim that when Lane paid himself $25,000 when the corporation was insolvent he violated his fiduciary duty both to the corporation and to its creditors. Because of this alleged breach of duty, Blocks argue that the corporate entity must be disregarded under the rule of *Harrison v. Puga,* 4 Wn. App. 52, 480 P.2d 247, 46 A.L.R.3d 415 (1971), in which the court states at page 63:

> [W]hen only the rights of plaintiff and defendant are to be determined, *there being no innocent third party rights involved,* then, notwithstanding that plaintiff's rights are initially against a corporation, the corporate entity may likewise be disregarded *as a matter of convenience, e.g., to avoid circuitous action.* Whether or not the defendant's overt intent was to disregard the corporate entity may be, but is not necessarily involved.

(Italics ours.)

The situation before us is a far cry from that in *Puga,* however. There the defendant was president and general manager and plaintiffs were stockholders of a corporation newly formed to purchase defendant's existing cable television business. After plaintiffs contributed substantial operating funds to this corporation, most of which went to pay defendant's salary and expenses, defendant breached his trust by purchasing necessary franchises and pole attachment agreements in his own name. Eventually defendant stripped the corporation of all of its assets while contending plaintiffs had breached the purchase agreement. Plaintiffs sought *restitution.* The court held defendant personally liable both because he had ignored the corporate entity and

to avoid a circuity of action, thus providing a remedy for his unjust enrichment.

Lane, on the other hand, drew no compensation for his services in attempting to save the faltering Olympic Health Spa. In addition he assumed personal liability for bank loans of $60,000 and advanced his own funds of approximately $50,000, taking only unsecured notes in exchange. Except for the $13,000 paid to the stockholders—which we have shown was not improper—use of these "infused" funds for legitimate corporation business is not questioned. Thus, unless Lane's position with the corporation, coupled with Olympic's insolvency dictate a different result, Lane stood on an equal footing with the other unsecured creditors of Olympic. The question thus becomes whether a corporate officer's acceptance of a preferential transfer from his insolvent corporation standing alone compels a piercing of the corporate veil. We think it does not.

Prior to 1931, this state followed the "trust fund" doctrine which holds that upon insolvency the corporate assets become a trust fund and corporate officers and directors owe the creditors a fiduciary duty to preserve and equitably distribute these assets. *Sterrett v. White Pine Sash Co.,* 176 Wash. 663, 30 P.2d 665 (1934); *Hein v. Forney,* 164 Wash. 309, 2 P.2d 741, 78 A.L.R. 631 (1931); *Thompson v. Huron Lumber Co.,* 4 Wash. 600, 30 P. 741 (1892). Under the trust fund doctrine any preferential transfer of corporate assets is "void," *Sterrett v. White Pine Sash Co., supra,* or "voidable," *Whiting v. Rubinstein,* 7 Wn.2d 204, 109 P.2d 312 (1941). With the adoption of chapter 47, Laws of 1931, the legislature confirmed the doctrine but limited its application to two types of transfers; first, all those made during insolvency to a creditor having reasonable cause to believe he was receiving a preference, and second, all preferential transfers occurring within 4 months of the date of application for appointment of a receiver, *Whiting v. Rubinstein, supra.* In 1941 the legislature enacted RCW 23.72.030 (Laws of 1941, ch. 103), which reads as follows:

> Any preference made or suffered within four months before the date of application for the appointment of a receiver may be avoided and the property or its value recovered by such receiver, if the person receiving the preference or to be benefited thereby or his agent acting therein shall then have reasonable cause to believe that the debtor corporation is insolvent. *No preference made or suffered prior to such four months' period may be recovered, and all provisions of law or of the trust fund doctrine permitting recovery of any preference made beyond such four months' period are hereby specifically superseded.*

(Italics ours.) As noted in *Engstrom v. De Vos,* 81 F. Supp. 854, 857 (E.D. Wash. 1949):

> The statute is a further modification of the trust fund doctrine, a long–standing Washington rule that the assets of an insolvent corporation constitute a trust fund for the benefit of its creditors and that transactions, which prefer one creditor over another, are voidable.

(Footnote omitted.)

■ As a general rule, the officers and directors of a solvent corporation may loan it money, take security therefor and be repaid without violating any fiduciary duty and without incurring liability to other creditors. 15A W. Fletcher, *Cyclopedia Private Corporations* § 7467 (rev. ed. 1969). On the other hand, the prevailing rule—31 jurisdictions according to Fletcher—is that such transfers are prohibited during insolvency and subject to being set aside for the benefit of all corporate creditors. 15A W. Fletcher, *supra* § 7468; 19 Am. Jur. 2d *Corporations* § 1574 (1965). According to Fletcher:

> The denial of the right of directors of an insolvent corporation to obtain a preference by way of security or payment of debts due them by the corporation is *not as a rule founded upon the trust fund doctrine,* but upon the theory that it is inequitable that a director, whose position as to knowledge of conditions and power to act for the corporation gives him an advantage, should be permitted to protect his own claim to the detriment of others at a time when it is apparent that all the unsecured

debts of the corporation are equally in peril, and that all of them cannot be paid.

(Footnote omitted. Italics ours.) 15A W. Fletcher, *supra* § 7469, at 234.

At least one Washington decision appears to permit a preference to a corporate officer during insolvency provided the transfer can withstand close scrutiny and is shown to have been both fair and equitable and not such as to constitute a fraud on creditors. *See Tacoma Ass'n of Credit Men v. Lester,* 72 Wn.2d 453, 433 P.2d 901 (1967); 15A W. Fletcher, *supra* § 7470. In the *Lester* case a preferential mortgage to a corporate president was held immune from attack as a voidable preference under RCW 23.72.030, having been accomplished more than 4 months before application for the appointment of the plaintiff receiver. The Supreme Court, however, affirmed the trial court's finding that defendant had not carried his burden of showing the preference was made in good faith; accordingly, the transfer was invalidated under RCW 19.40 (Uniform Fraudulent Conveyance Act).[4] Here, Lane completely controlled and directed Olympic's business affairs; he was aware the corporation was insolvent and he intended to secure a personal advantage over other creditors. In these circumstances the preference would appear to be recoverable by Olympic's receiver as a fraudulent conveyance under *Tacoma Ass'n of Credit Men v. Lester, supra*; it would clearly be recoverable by the receiver under the majority rule alluded to by

---

[4]We doubt that Washington fairly can be numbered among the minority of states which 15A W. Fletcher, *Cyclopedia Private Corporations* § 7468 (1967) lists as permitting such preferences, in view of *Tacoma Ass'n of Credit Men v. Lester,* 72 Wn.2d 453, 433 P.2d 901 (1967), which reads at page 459 n.1:

This conclusion [the trial court's finding of fraud] seems to be consistent with those reached in other jurisdictions. As stated in R. Baker and W. Cary, Corporations 625 (3d ed. unabr. 1959):

In most jurisdictions . . . a preference given by an insolvent corporation to a director or officer is invalid as against creditors, at least if the interested officer or director participates in the corporate action by which the preference is granted.

Thus if squarely presented with the issue, we believe it is entirely possible our courts could find an invalid preference without having to resort to RCW 19.40.

Fletcher. However, the mere fact that a corporate officer may have received an improper preference does not mean that the corporate entity must be disregarded so as to render him liable directly to all corporate creditors. We know of no decision which so holds. Clearly, if Blocks are permitted to recover in full upon their judgment they would be securing by indirection the very preference over other creditors which the law precludes. *See Child v. Western Lumber Exch.*, 133 Wash. 53, 233 P. 322 (1925) and *P.B. Yates Mach. Co. v. Lakin*, 113 Wash. 45, 192 P. 982, 12 A.L.R. 243 (1920).[5]

Finally, we do not think this is a proper case for application of the rule of *Harrison v. Puga, supra.* Should Lane's creditors—acting through a receiver—be successful in invalidating the preference, recovery would be measured by the amount of transfer, not by the corporation's liability on the lease. This is best illustrated by assuming the following hypothetical example:

Corporation X owes A $30,000 and corporate officer B $3,000.

X becomes insolvent.

B prefers himself with a $3,000 payment.

No receiver is appointed.

A sues B.

Under Blocks' theory, B becomes personally liable to A for $30,000 merely to avoid the alleged circuity involved in having a receiver appointed. But, we perceive no particular circuity in requiring an insolvent corporation's creditors to proceed through their representative so they may share ratably in any recovery, instead of proceeding individually for their own accounts. In the illustration X is always liable to A for $30,000, but the damage to X—and ultimately its creditors—from B's act does not exceed $3,000. Clearly

---

[5]Both *Child v. Western Lumber Exch.*, 133 Wash. 53, 233 P. 322 (1925) and *P.B. Yates Mach. Co. v. Lakin*, 113 Wash. 45, 192 P. 982, 12 A.L.R. 243 (1920) were decided under Washington's then prevailing trust fund theory. Although the trust fund doctrine has been abrogated, the rationale for precluding individual action by creditors for their own account remains the same.

there is no basis in law demanding that B pay X's debt to A. Such a result also ignores the other corporate creditors who may be the "innocent third parties" referred to in *Harrison v. Puga, supra.*

The judgment against Olympic is affirmed and the judgment against Lane on the lease is reversed.

PEARSON, C.J., and SOULE, J., concur.

Reconsideration denied February 5, 1980.

Review denied by Supreme Court April 24, 1980.