**VAN DIEST SUPPLY COMPANY,**
**Respondent,**

v.

**ADRIAN STATE BANK, Appellant.**

**No. 50926.**

Supreme Court of Minnesota.

May 8, 1981.

Brecht, Hedeen & Hughes and William T. Hedeen, Worthington, Faegre & Benson and Hendrik De Jong, Minneapolis, for appellant.

Gislason, Dosland, Hunter & Malecki, and Robert M. Halvorson, New Ulm, for respondent.

AMDAHL, Justice.

Van Diest Supply Company brought this action against Adrian State Bank to obtain a declaratory judgment that Van Diest's subordinate security interest in assets of A & B Seed & Chemical Company has priority over a security interest given by A & B to the bank several months earlier.. The bank appeals from the judicial declaration that Van Diest's lien has priority over the bank's lien because the bank waived, released, or subordinated its security interest to that of Van Diest by failing to advise Van Diest of its claim.

Stipulated facts relative to the creation of the parties' security interests and their course of conduct when A & B defaulted on the secured debts include the following: For several years prior to July 1975, Alice Jean Anker retailed seed and farm chemicals under the name A & B Seed & Chemical. In August 1975 Mrs. Anker incorporated her business and on January 21, 1976, transferred its assets to the corporation. Prior to that time, the corporation had applied for a loan from the bank to be guaranteed by the Small Business Administration (SBA), and on January 21, 1976, the bank made a loan of $100,000 to A & B for which the SBA issued a 90% payment guaranty to the bank. On January 23, the bank made a loan to A & B of $60,000 for working capital; no part of this loan was guaranteed by the SBA.

The SBA-guaranteed loan was used to construct a retail store, and was secured by a first mortgage on the retail store and a mortgage on the Anker homestead. In addition, a security interest in the corporation's personal property was given to the bank to guarantee both loans. The bank perfected its security interests by filing financing statements with the Nobles County

recorder on January 30, 1976, and with the secretary of state on February 3, 1976. The loan for working capital was renewed in March 1977 for $54,000. A & B made one payment on this obligation in April 1977, leaving a balance due of $53,780.

In the spring of 1976 Van Diest sold chemicals to A & B on an open account. In November 1976, in response to demands for payment of the account, A & B gave Van Diest two notes totalling $57,000, one payable on December 15, 1976, the other on January 15, 1977. To secure their payment A & B granted Van Diest a security interest in the corporation's personal property; Van Diest perfected this interest by filing financing statements on November 8, 1976 with the secretary of state. The notes were not paid when due and on April 15, 1977, Van Diest brought an action in the Nobles County District Court to foreclose its security interest. On April 23, 1977, that court issued an order giving Van Diest possession of the collateral and on May 16, 1977, determined that Van Diest was entitled to judgment for $63,700 against A & B.

The foreclosure constituted a default under the loan guaranty agreement between the Bank and the SBA. The bank had notice of the action and notified the SBA, requesting that it pay the bank 90% of the balance due on the SBA-guaranteed loan in accord with the guaranty agreement. The SBA's representative then met with the bank and Van Diest, and they agreed that a public auction of A & B's assets should be held. The sale was delayed because two seed companies which had supplied a large quantity of seed to A & B claimed the right to repossess it. As a result, the SBA, the bank, and Van Diest agreed to release the seed to those companies upon condition that the companies place $52,312 in escrow, pending resolution of the parties' claims.

On May 5, 1977, the bank assigned its real estate mortgages and the security agreement it had received on January 21, 1976, and the financing statements covering A & B's personal property to the SBA. The SBA then paid the bank $84,633.07, 90% of

the balance still due on the loan it had guaranteed. On May 19, 1977, A & B's personal property, other than the seed inventory, was sold at a public auction from which $38,068.70 was realized. In August 1977 the SBA foreclosed the mortgage on A & B's building, bidding it in for $42,338 at the foreclosure sale.[1] On August 30, 1977, the bank duly filed UCC-3 statements of assignment of the financing statements it had filed earlier.

The controversy with the seed companies was settled in January 1978, the SBA receiving $38,894 of the amount which had been placed in escrow. Neither of the parties received any part of the settlement. The SBA has asserted no claim to the proceeds of the May 1977 sale, and each party here claims that its lien entitles it to those proceeds.

In addition to the stipulated facts, the parties also presented evidence on the issue of priority. Anthony Moser, a liquidation officer of the SBA, called as a witness by Van Diest, said that the bank had the option either to enforce the guaranty or to cancel it and decide for itself what action to take to obtain payment of the guaranteed loan. Moser recalled that A & B had given the bank a separate note for the $60,000 advanced for working capital and testified further that the bank "had a first lien on, I don't know now whether inventory, receivables or what, but I know the bank was in there first on some part of it." The bank introduced a recomputation by the SBA of the sale proceeds which stated that the bank should receive all of the proceeds because "they have first lien on this property." The bank's president testified also that its assignments of the SBA-guaranteed note, security agreement, and financing statement were made in May 1977 at the request of the SBA. The note received for the inventory loan was not assigned.

Based on this evidence, the trial court first found that the bank in exercising its option under the SBA loan agreement, had "duly assigned to SBA . . . all its perfected

---

1. After expiration of the time for redemption the SBA sold the property for $51,000.

security interest in and to the property of A & B by duly assigning its security agreement and financing statement to SBA without recourse, reservation, or exception" and that it had duly filed a statement of assignment of its financial statement to the SBA which also did not indicate any recourse, reservation, or exception. The trial court concluded that Van Diest was entitled to judgment declaring that it has a perfected security interest in the proceeds of A & B's property superior to any security interest or other claim of the bank.

The bank moved alternatively for a new trial or for two amended findings: (1) that the bank had not released or waived its security interest in A & B's assets insofar as that interest secured the inventory loan or the bank's 10% participation in the SBA-guaranteed loan; and (2) that the SBA had delivered the proceeds of the May 1977 sale of A & B's inventory to the bank in recognition of the bank's prior security interest therein as security for the inventory loan. In support of its motion for amended findings the bank filed an affidavit describing their evidentiary basis and moved for a hearing to permit the bank to offer such evidence. In opposition to the motion, Van Diest's attorney filed an affidavit in which he denied the averment of the bank's attorney that the parties had agreed that the bank should make the assignments to the SBA merely to permit the SBA to conduct foreclosure proceedings "in the interests of all the parties, as those interests existed before the collateral was delivered to the SBA." Van Diest's attorney alleged that he had agreed to allow the SBA to conduct the liquidation of A & B's personal property because the SBA had a first lien thereon after the bank's assignment. He averred also that he had discussed Van Diest's claim to priority with both the SBA and the bank prior to the foreclosure sale, that neither had informed him of any reservation of rights by the bank in its assignment to the SBA, and that he had concluded from the assignment documents and the parties' conduct that the bank had made a "complete transfer" of its security to the SBA. He also stated that Van Diest agreed to the settlement with the seed companies because he had relied on the assignments and that Van Diest did not redeem from the SBA's foreclosure of the mortgage on the A.& B building because he anticipated that there would be sufficient funds realized from the sale of the inventory to satisfy Van Diest's judgment.

In response to the bank's motion, the trial judge amended the prior findings to state that the bank had exercised its option under the SBA loan agreement and had assigned the guaranteed note and its perfected interest in and to the property of A & B by assigning the security agreement and financing statement to the SBA "to the extent required by the loan agreement." He also found that the statement of assignment of the financial statement had been filed on August 30, 1977, pursuant to the terms of the loan guaranty agreement. The statement of assignment provided that the SBA and the bank shared jointly the benefit of any security or collateral either may have in the property of the debtor, were obligated to share ratably in expenses incurred by the SBA, and were entitled to receive a ratable share of all repayments realized.

The trial court further found that, prior to the foreclosure sale, Van Diest was made aware of the contents of the documents of assignment, believed them to be a full and complete assignment of the bank's interests, and relied upon that belief and upon the assignments to its detriment by agreeing to the compromise settlement of the seed companies' claims, by foregoing its right to redeem from the real estate foreclosure, and by "close cooperation and consultation" with the bank and the SBA in foreclosing collateral and collecting assets of A & B. The court further found that this "close and friendly cooperation" imposed upon the bank the duty to make a good faith disclosure to Van Diest of the bank's claimed interest in the property of A & B and the proceeds of its sale, that the bank violated this duty to make disclosure to Van Diest when it "should have known and it did know" that Van Diest believed

that the bank had assigned its full interest to the SBA, that Van Diest's belief and reliance thereon were reasonable, and that the bank's failure to inform Van Diest of the claimed interest constituted a waiver, release or subordination of its security interest in A & B's assets and the proceeds thereof, to the extent that interest had secured the inventory loan and the 10% interest in the SBA loan, to the security interest of Van Diest in such assets. It concluded that Van Diest was entitled to judgment declaring that it has a lien in the proceeds of the sale of such collateral superior to any security interest or other claim of the bank.

The threshold issue raised on the bank's appeal to this court is the effect of the assignments to the SBA. The bank urges that the trial court correctly determined that the assignments, which had been required under the terms of the SBA loan agreement when the bank exercised its option to obtain performance of the guaranty, did not extinguish the bank's security interest insofar as it secured the $60,000 inventory loan and the nonguaranteed portion of the SBA-guaranteed loan. Van Diest questions whether the trial court did so determine, however, our review of the trial court's findings leads us to that conclusion. Van Diest also urges that assignments absolute on their face must be held to transfer the entire security interest of the assignor and that a finding to the contrary is opposed to the spirit and policy of the Uniform Commercial Code. Minn.Stat. §§ 336.-1–101–.11–108 (1980).

The Uniform Commercial Code aims to simplify and modernize the laws governing commercial transactions. Minn.Stat. § 336.-1–102 (1980). The Code, however, has no express provision governing the effect of an assignment of a security interest which affords security for more than one debt when the assignor does not assign all of the indebtedness secured by that interest. Therefore, the effect of the assignment in the instant case must be determined by general principles of law. Minn.Stat. § 336.1–103 (1980). Those principles require the conclusion that the trial court correctly determined that the bank's security interest in the indebtedness not guaranteed by the SBA was not extinguished by the assignments.

The cardinal principle of common law applicable to the issue before us is that the collateral security for a debt is an incident of the debt. One consequence of this principle is that the transfer of collateral unaccompanied by a transfer of the debt is a nullity. *Sobel v. Mutual Development, Inc.,* 313 So.2d 77 (Fla.App.1975); 6 Am. Jur.2d *Assignments* § 26 (1963); 69 Am. Jur.2d *Secured Transactions* § 449 (1973); 14 C.J.S. *Chattel Mortgages* § 316 (1939). Another consequence, based on the fact that substantive ownership of a lien or security interest cannot be separated from ownership of the debt, is that if an assignor assigns a debt and the security interest from which it may be satisfied, but retains the other debts which were also secured by that security interest, the assignee holds the collateral which is subject to the security interest for the benefit of the assignor to the extent that it is not required to satisfy the assigned debt. *See Mutual Trust Life Insurance Co. v. Ecklund Building Co.,* 180 Minn. 544, 231 N.W. 207 (1930); *Wilson v. Eigenbrodt,* 30 Minn. 4, 13 N.W. 907 (1882); *Second National Bank v. Dyer,* 121 Conn. 263, 184 A. 386 (1936). Therefore, the assignment to the SBA of the SBA-guaranteed note, security agreement, and financing statement reserved as a matter of law the bank's security interest to the extent the bank retained the indebtedness secured by the collateral—the nonguaranteed portion of the SBA-guaranteed note and the $60,000 inventory note—and the SBA, after obtaining reimbursement of the amount it had paid the bank under the guaranty, held title to the collateral and its proceeds for the benefit of the bank. This result is consistent with the fact that the Uniform Commercial Code permits a holder of a security interest to represent the principal owner or owners of the security interest. *See* Minn.Stat. § 336.9–105(1)(m) (1980).

Van Diest urges, in spite of these authorities, that the assignments destroyed the bank's security interest, relying on *Empire Machinery Co. v. Union Rock & Materials Corp.*, 119 Ariz. 145, 579 P.2d 1115 (Ariz. App.1978). Van Diest's reliance on that case is misplaced because in *Empire Machinery* the assignor transferred its entire indebtedness as well as its security interest and thus could not have retained any beneficial interest in the collateral or its proceeds.

 It is clear that the filing of the UCC-3 statements would not divest the bank of its security interest. The Fifth Circuit Court of Appeals recognized in the case of *In re King-Porter Co. Inc.*, 446 F.2d 722 (5th Cir. 1971), that the consequence of the filing of a notice of the assignment of a security interest under the Uniform Commercial Code was to make the assignee the secured party of record only. The court there stated that the "notice" system of the Code is intended merely to give notice that a secured party of record may have a security interest in the collateral described and that it invites further inquiry "to disclose the complete state of affairs." 446 F.2d at 729. The filing procedure could not, therefore, work a substantive assignment where none was intended by the parties. The reasonableness of this view is shown by Minn.Stat. § 336.9–405(2) (1980) which makes it clear that the filing of an assignment of a security interest is permissive rather than mandatory. We conclude that the trial court properly determined that the bank's security interest was not destroyed by its assignments.

The trial court's further determination that, in spite of the described retention by the bank of its security interest, that interest had been waived, released, or subordinated to Van Diest's security interest raises other issues which at this point cannot be resolved. The findings underlying the determination—that the bank had a duty to disclose its intention to enforce its retained security interest and failed to do so, knowing that Van Diest believed that it had no claim against the proceeds of the inventory sale in May 1977, and that Van Diest reasonably acted in reliance on that belief to its detriment—have no support in admissible evidence, being based almost exclusively on the affidavit of Van Diest's counsel opposing the bank's motion for amended findings or a new trial. Thus, we are unable to determine from the record whether the claimed duty of disclosure did in fact exist and, if it did, the effect of its breach. Accordingly, the judgment must be reversed insofar as it relates to these issues. In the interests of justice we remand for trial thereon.

Affirmed in part, reversed in part, and remanded.