[Nos. 16353-1-I; 16404-0-I. Division One. May 26, 1987.]

UNI–COM NORTHWEST, LTD., *Appellant,* v. ARGUS PUBLISHING COMPANY, *Defendant,* JOHN S. MURRAY, ET AL, *Respondents.*

788

*Nicholas P. Scarpelli, Jr.,* and *Carney, Stephenson, Badley, Smith, Mueller & Spellman,* for appellant.

*William Robert Hickman, John W. Rankin, Jr., Pamela A. Okano,* and *Reed, McClure, Moceri, Thonn & Moriarty,* for respondents.

PATRICK, J.*—This litigation resulted from the sale by Advertising Distributor Services, Inc. (ADS) to Argus Publishing Company of all the common stock in and right to operate TMC Publications, Inc. The successor in interest of ADS, Uni–Com Northwest Ltd. (Uni–Com), appeals and Murray Publishing Company (MPC) cross–appeals from a judgment in favor of Uni–Com for $144,406.40. Uni–Com contends MPC is liable for the unpaid purchase price of TMC Publications, Inc., as a successor corporation of Argus Publishing Company. Uni–Com also contends John Murray, MPC and the MPC pension trust are liable under agency and corporate disregard theories. MPC contends its take–over of Argus Publishing Company's accounts receivable was not a preference, and a receiver should have been appointed to resolve the conflicting claims between MPC and Uni–Com. We reverse the trial court insofar as it granted judgment to Uni–Com against MPC and affirm in all other respects.

## FACTS AND PROCEDURAL POSTURE

During summer 1981 the president of ADS, Tom Coad, solicited publishers and printers to invest in TMC Publications, Inc. MPC authorized Murray to invest in TMC

---

*The Honorable Richard G. Patrick is serving as a judge pro tempore of the Court of Appeals pursuant to CAR 21(c).

Publications, Inc., on behalf of the MPC pension trust. However, nothing came of Coad's efforts and ADS held all the common stock of TMC Publications, Inc., in exchange for an investment of $60,000.

In August 1981, TMC Publications, Inc., began a marriage mail operation in parts of King County and South Snohomish County under the name "TMC Weekend." Also in August 1981, Argus Publishing Company began a marriage mail operation in Renton, Kent, and Auburn under the name "Argus Southender." A noncompetition agreement prevented ADS and TMC Publications, Inc., from operating a marriage mail business in Renton, Kent, or Auburn. Marriage mail consists of separate full page advertisements ("inserts"); a community newspaper containing advertising on its pages ("wrap"); and a "detach card," which contains an address label on one side and advertising on the other. A retailer achieves greater market penetration through marriage mail than through subscription newspapers.

At all times pertinent, John Murray has owned 100 percent of the stock of Argus Publishing Company and 60 percent of the stock of MPC. His children own the remaining 40 percent of MPC's stock. Argus Publishing Company and MPC have the same directors. With one exception, Argus Publishing Company and MPC have the same officers.

In fall 1981, Coad decided to sell TMC Publications, Inc. The only viable offer he received was from Murray, acting on behalf of Argus Publishing Company. The parties ultimately agreed Argus Publishing Company would purchase all the common stock of TMC Publications, Inc. from ADS for $1 million. Payment terms were to be $100,000 down personally guaranteed by Murray, and unsecured payments of $10,000 per month at no interest.

Coad testified Murray at all times represented Argus Publishing Company in his negotiations for TMC Publications, Inc. Murray specifically told Coad that Argus Publishing Company was in tenuous financial condition. Coad and Norm Reeves, who later became president of Uni–Com,

had extensive discussions about the necessity for security. However, Murray refused to put up any security other than his personal guaranty of the $100,000 down payment.

Coad knew the "TMC Weekend" was a risky proposition when he sold it. He termed the venture "nerve–wracking," particularly because TMC could never obtain written contracts from its two largest customers, Sears and Pay'n Save. Pay'n Save also desired a single, region–wide advertising medium, but ADS could not provide it because of its non-competition agreement. Coad testified TMC Publications, Inc. was essentially a "business opportunity," having few tangible assets but great potential under proper management and marketing. He knew it would be much easier for Argus Publishing Company to pay ADS if the "TMC Weekend" made a profit.

Argus Publishing Company made the down payment for TMC Publications, Inc., with funds provided by the MPC pension trust, and changed the publication's name to the "Argus Weekend." Argus Publishing Company made additional payments totaling $30,000 through April 1982. It then totally ceased making payments, leaving an outstanding principal balance of $870,000. In April 1983, Uni–Com sent Argus Publishing Company a formal notice of default. Uni–Com commenced this action in May 1983 against Argus Publishing Company for breach of contract and against John Murray personally on a corporate disregard theory.

MPC did all of Argus Publishing Company's printing, and Argus Publishing Company had been chronically behind on its printing bill since at least 1967. In fall 1983, MPC perfected a security interest in all the inventory, intangible property and accounts receivable of Argus Publishing Company.

Powell River–Alberni Sales Corporation was a major supplier of newsprint to MPC. In April 1984, Powell River perfected a security interest in MPC's accounts receivable. At that time, MPC also executed an assignment to Powell River of MPC's security interest in Argus Publishing Com-

pany's accounts receivable. The assignment was duly filed. MPC retained its perfected security interest in all of Argus Publishing Company's other assets.

Also in April 1984, Uni–Com filed an amended complaint against Argus Publishing Company, MPC, the MPC pension trust, and John Murray. The amended complaint alleged liability based upon agency, corporate disregard, and successor theories.

By November 1984, Argus Publishing Company's printing debt to MPC had risen to $1,216,341.59. The only business of Argus Publishing Company at that time was the "Argus Weekend." Murray stated at the annual meeting of MPC shareholders on November 9, 1984, that "it would be poor business judgment to continue to subsidize Argus if future profits would be placed in peril by third parties."[1] MPC decided to foreclose its security interest in Argus Publishing Company's assets, effective January 1, 1985. Argus Publishing Company acquiesced.

MPC notified Powell River's parent corporation, Mac-Millan–Bloedel, Ltd., of MPC's intent to take over Argus Publishing Company. MacMillan–Bloedel's corporate credit manager testified Powell River was fully secured by the MPC accounts receivable as of November 1984, because by that time MPC only owed Powell River $100,000 and MPC had accounts receivable of over $400,000. The credit manager determined the take–over of Argus Publishing Company was "immaterial to Powell River," and he therefore did not respond to MPC's letter.

Argus Publishing Company ceased operations on December 31, 1984, and the transfer of assets to MPC was completed on January 1, 1985. MPC, through Murray, assigned a value of $50,000 to Argus Publishing Company's intangibles (*i.e.,* the right to publish the "Argus Weekend"), and a value of approximately $5,000 to Argus Publishing Company's equipment and inventory. MPC also took over accounts receivable valued at $144,000. MPC paid all of

---

[1]Murray later admitted he was referring to this litigation.

Argus Publishing Company's debts except the promissory note to ADS. MPC planned to credit Argus Publishing Company's printing account by the value of the assets received, and write off the remainder of the printing debt as a bad debt tax deduction.

In March 1985, the superior court granted a partial summary judgment dismissing Uni–Com's agency and corporate disregard claims against MPC, the MPC pension trust, and John Murray. After the remaining issues were set for trial, MPC moved for appointment of a receiver to determine the conflicting claims between MPC and Uni–Com in Argus Publishing Company's assets. The trial court denied the motion and proceeded with the trial.

The trial court held Uni–Com had failed to prove any successor liability by MPC. It also held that, when MPC took over Argus Publishing Company, MPC was no longer a secured creditor by virtue of its assignment to Powell River. Therefore, the court reasoned, the take–over was a voidable preference in the amount of the value of Argus Publishing Company's accounts receivable as of December 31, 1984. The trial court also ruled Uni–Com's right to the accounts receivable was superior to MPC's claim by virtue of the judgment the court would render in favor of Uni–Com against Argus Publishing Company. The court again declined to appoint a receiver and fixed the value of the accounts receivable at $144,000. This consolidated appeal timely followed. The court's judgment in favor of Uni–Com against Argus Publishing Company has not been appealed.

## ACCOUNTS RECEIVABLE

We initially consider MPC's argument it had the status of a secured creditor when it took over Argus Publishing Company's accounts receivable on December 31, 1984. We agree and reverse the judgment in favor of Uni–Com against MPC.

It is undisputed MPC's security interest was validly perfected as of October 1983, and its purpose was to secure a valid, existing debt of over $1.2 million. It is also undis-

puted the assignment to Powell River by MPC of its security interest in Argus Publishing Company's accounts receivable was for the purpose of securing payment of a valid debt by MPC to Powell River.

■ As pointed out by MPC, the trial court failed to distinguish between the effect of an absolute assignment and an assignment for security. An absolute assignment divests the assignor of all control and right to a cause of action against the original debtor; the assignee is entitled to control and to receive the benefits of the contract between the original debtor and the assignor. *Empire Mach. Co. v. Union Rock & Materials Corp.,* 119 Ariz. 145, 579 P.2d 1115 (Ct. App. 1978); *McCown v. Spencer,* 8 Cal. App. 3d 216, 87 Cal. Rptr. 213 (1970). On the other hand, an assignment for security conditions transfer of title upon the assignor's default.

> Thus, the essential feature of a valid "conditional assignment for purposes of security" is that title to the collateral (*e.g.,* an insurance policy) is retained by the assignor subject to his performance of an *independent* obligation owed to the assignee. The situation thus described is one where the debtor has the alternatives of (1) performing the condition and retaining the collateral or (2) not performing the condition and forfeiting the collateral.

*Miller v. Wells Fargo Bank Int'l Corp.,* 540 F.2d 548, 559 (2d Cir. 1976).

The transaction between MPC and Powell River was clearly an assignment for security. *See* RCW 62A.9–102 (Article 9 is applicable to a security interest in a secured obligation); Washington Comment, RCWA 62A.9–405 (interest of a secured party is chattel paper which may be transferred subject to UCC perfection and priority principles as other chattel paper). Thus MPC had the right to foreclose upon Argus Publishing Company's accounts receivable so long as MPC remained current in its payments to Powell River. Any potential impairment of Powell River's security by MPC would be a matter between those two parties only. Here, the disposition was approved by

Powell River.

Uni–Com argues the UCC–3 notice of assignment was by its terms an absolute assignment. We disagree.

> It is clear that the filing of the UCC–3 statements would not divest the [assignor] of its security interest. The Fifth Circuit Court of Appeals recognized in the case of *In re King–Porter Co. Inc.,* 446 F.2d 722 (5th Cir. 1971), that the consequence of the filing of a notice of the assignment of a security interest under the Uniform Commercial Code was to make the assignee the secured party of record only. The court there stated that the "notice" system of the Code is intended merely to give notice that a secured party of record may have a security interest in the collateral described and that it invites further inquiry "to disclose the complete state of affairs." 446 F.2d at 729. The filing procedure could not, therefore, work a substantive assignment where none was intended by the parties. The reasonableness of this view is shown by [Uniform Commercial Code section] .9–405(2) . . . which makes it clear that the filing of an assignment of a security interest is permissive rather than mandatory.

*Van Diest Supply Co. v. Adrian State Bank,* 305 N.W.2d 342, 347 (Minn. 1981). *Accord, Empire Mach. Co. v. Union Rock & Materials Corp., supra;* Official Comment, RCWA 62A.9–405.

Uni–Com argues MPC waived any right to a deficiency, including any right to the accounts receivable, because MPC elected to retain the inventory and equipment of Argus Publishing Company. However, MPC had a perfected security interest in Argus' accounts receivable and was therefore entitled to them under RCW 62A.9–505(2).

MPC had the position of a secured creditor when it foreclosed upon Argus Publishing Company's assets. Our holding renders it unnecessary to address MPC's other contentions regarding the status of the Argus Publishing Company security interest. Nor do we need to address whether the trial court abused it discretion in declining to appoint a receiver.

We next turn to Uni–Com's appeal. It claims error in the

summary judgment dismissal of its agency and corporate disregard theories and in the trial court's finding of no successor liability.

## AGENCY

Uni–Com contends Murray personally, MPC and the MPC pension trust were all three undisclosed principals of Argus Publishing Company. Uni–Com primarily relies upon August and December 1981 MPC corporate minutes and the deposition of Tom Coad.

Coad admitted the August 1981 MPC minutes authorizing Murray to invest in TMC Publications, Inc., on behalf of the MPC pension trust had nothing to do with the sale of TMC Publications, Inc., to Argus Publishing Company later that year. Rather, ADS had solicited investors when it first started TMC Publications, Inc.

The December 1981 MPC minutes state the TMC purchase was made for the pension trust but was actually made through Argus Publishing Company to "expedite" the sale. Coad testified he did not know the source of the down payment was the MPC pension trust.

█ Respondents correctly assert there is no issue of an undisclosed versus disclosed principal unless an agency relationship exists. *See Matsumura v. Eilert,* 74 Wn.2d 362, 363, 444 P.2d 806 (1968) ("[b]efore the sins of an agent can be visited upon his principal, the agency must be first established."). The existence of a principal–agent relationship is a question of fact unless the facts are undisputed. *Bloedel Timberlands Dev., Inc. v. Timber Indus., Inc.,* 28 Wn. App. 669, 626 P.2d 30 (1981). The two elements of an agency are mutual consent and control by the principal of the agent. *Moss v. Vadman,* 77 Wn.2d 396, 463 P.2d 159 (1969); *Matsumura v. Eilert, supra; Turnbull v. Shelton,* 47 Wn.2d 70, 286 P.2d 676 (1955); *Japan Petroleum Co. (Nig.) Ltd. v. Ashland Oil, Inc.,* 456 F. Supp. 831 (D. Del. 1978).

The crucial factor is the right of control which must exist to prove agency. Control is not established if the asserted

> principal retains the right to supervise the asserted agent merely to determine if the agent performs in conformity with the contract. Instead, control establishes agency only if the principal controls the manner of performance, . . .

(Citations omitted.) *Bloedel Timberlands Dev., Inc. v. Timber Indus., Inc., supra* at 674. *Accord, Japan Petroleum Co. (Nig.) Ltd. v. Ashland Oil, Inc., supra.* If control is not established, then the relationship may be one of buyer and seller, for example, rather than principal and agent. *Moss v. Vadman, supra.*

Here, Murray certainly exerted control over Argus Publishing Company. However, there is no evidence he intended to take over TMC personally, or that Argus was his agent for personal business. *Truckweld Equip. Co. v. Olson,* 26 Wn. App. 638, 618 P.2d 1017 (1980). To hold Murray personally liable would seem to be a disguised way of finding corporate disregard. *See Barnett Bros. v. Lynn,* 118 Wash. 308, 203 P. 387 (1922) (mere fact shareholders voted to approve contract between corporation and plaintiff not enough to impose personal liability on shareholders).

Nor is there any evidence MPC or the MPC pension trust exercised the requisite control over Argus Publishing Company. Rather, MPC was a creditor of and the trust was an investor in Argus Publishing Company.

Both sides extensively discuss *Japan Petroleum.* The court there dismissed plaintiff's agency theory on summary judgment after analyzing the relationship between a subsidiary, its parent corporation and the shareholders of the subsidiary (themselves wholly owned subsidiaries of the parent). The court held the following combination of factors did not establish an agency as a matter of law: parent held voting shares in the subsidiary, parent and subsidiary had some common officers and directors, parent extended credit to the subsidiary, parent benefited from the subsidiary's operations, and parent and subsidiary had joint management programs and joint operations. The court emphasized the corporations at all times kept separate

records and bank accounts, had some separate employees, and the subsidiary had rights and obligations in its own right. The relationships in this case are similar.

The superior court correctly ruled there was no genuine issue of fact regarding agency. Because there was no agency, there was no issue of undisclosed principals. Nor do we need to address respondents' Uniform Commercial Code argument regarding the effect of a principal's failure to sign a promissory note.

## CORPORATE DISREGARD

Uni–Com also contends it raised a genuine issue of material fact regarding corporate disregard. In support of this theory, Uni–Com relies upon the MPC and Argus Publishing Company corporate minutes and upon the depositions of John Murray, Robert Heide, Evelyn Canan, and Tom Coad. Heide and Canan were officers, directors, and long–time employees of MPC. They were also officers and directors of Argus Publishing Company, and former trustees of the MPC pension trust. Uni–Com claims these facts create an issue whether Argus Publishing Company, MPC and the MPC pension trust were merely alter egos of Murray: Argus Publishing Company was continually undercapitalized, Murray dominated the corporations and made all decisions, the officers and directors had no responsibilities, and corporate formalities were not observed. Uni–Com also argues the fact ADS specifically agreed to forgo security for the monthly payments is immaterial because ADS did not know Argus was so under-capitalized that even the down payment had to be borrowed.

■ *Truckweld Equip. Co. v. Olson, supra,* is directly on point. The court there emphasized the doctrine of disregarding the corporate entity is an equitable remedy and will be imposed only in exceptional cases to prevent fraud or manifest injustice. As here, the creditor in *Truckweld* knew the corporation was in shaky financial condition, but failed to inquire further. The court stated Truckweld could

have sought the sole shareholder's personal guaranty, and Truckweld's failure to utilize adequate safeguards contributed to its loss, not any abuse of the corporate form. Here, Coad specifically bargained for security and failed to obtain it. There is no evidence knowledge of the source of the down payment would have altered ADS' decision to sell to Argus Publishing Company.

Also as here, the shareholder in *Truckweld* initially took over a corporation in bad financial condition. Murray testified Argus Publishing Company was in debt when he took it over in 1967 and it was continually in tenuous financial condition. The *Truckweld* court noted the shareholder there had not induced the plaintiff in any way to deal with the corporation through any promises of further infusions of capital. The court stated at page 645, "We know of no rule of law requiring a corporate stockholder to commit additional private funds to an already faltering corporation." (Footnote omitted.) *See also Sommer v. Yakima Motor Coach Co.,* 174 Wash. 638, 26 P.2d 92 (1933) (two companies may have identical directors and officers, joint operations, a close working arrangement, and one may grant credit to the other, without their being intended to function as one or to work a fraud on others).

The court also held in *Truckweld* any failure by the shareholder to respect corporate formalities did not cause the plaintiff's loss. The court stated at page 644, "we cannot see how Truckweld's position would be different had Aztec meticulously documented its corporate actions." *Accord, Meisel v. M & N Modern Hydraulic Press Co.,* 97 Wn.2d 403, 645 P.2d 689 (1982) (even if there has been an abuse of the corporate form, personal liability will not be imposed unless that abuse caused the plaintiff's harm); *Block v. Olympic Health Spa, Inc.,* 24 Wn. App. 938, 604 P.2d 1317 (1979) (corporate veil would not be pierced where none of the informalities between the shareholder and the corporation could reasonably have led the plaintiff to believe it was dealing with the shareholder rather than the corporation). Here, the alleged corporate informalities evince Murray's

habit of taking an action and then later telling the other directors about it without giving them an opportunity to participate in decisionmaking. However, Uni–Com has not demonstrated any link between its harm and the manner in which Murray made decisions within his corporations.

The superior court properly granted summary judgment dismissal of Uni–Com's corporate disregard theory.

## SUCCESSOR LIABILITY

Lastly, Uni–Com vigorously argues MPC is liable on the promissory note as a successor corporation. MPC laid off most of Argus Publishing Company's staff and kept the remainder as MPC employees when MPC took over Argus Publishing Company. Argus Publishing Company ceased doing business, but Murray remained as sole shareholder. The only Argus business at the time of take–over was the "Weekend." The "Argus Weekend" business continued in the same physical facilities after the take–over. MPC paid all of Argus' current operating expenses, credited any remaining accounts collected to Argus' printing debt to MPC, and took a bad debt tax deduction for the remainder of the Argus printing debt. Thus the only debt avoided by the take–over was the $870,000 plus interest remaining on the promissory note to ADS (now Uni–Com). MPC has continued Argus' business, although printing continues to comprise approximately 50 percent of MPC's business.

The rules regarding successor liability in the commercial credit context are stated in *Martin v. Abbott Laboratories,* 102 Wn.2d 581, 609, 689 P.2d 368 (1984):

> Traditionally, a corporation purchasing the assets of another corporation does not, by reason of the purchase of assets, become liable for the debts and liabilities of the selling corporation. The courts have recognized, however, that the traditional rule allows a transferring corporation, under certain circumstances, to effectively avoid its obligations to the detriment of *creditors* and minority *shareholders.* Thus, Washington has recognized four narrow exceptions to the traditional rule: (1) the purchaser expressly or impliedly agrees to assume liability; (2) the purchase is a de facto merger or consolidation; (3) the

purchaser is a mere continuation of the seller; or (4) the transfer of assets is for the fraudulent purpose of escaping liability. In any of these four circumstances, the court will find that the acquiring entity is a successor to the liabilities and obligations of the selling corporation.

(Citations omitted.)

Regarding the first exception, an agreement is not implied from the mere fact a new corporation has voluntarily paid some of the debts of the old corporation, without further manifestation of an intent to pay all of its debts.

[I]n order that a promise may be implied, on the part of a corporation, to pay the debts of another corporation, to the property and franchises of which it has succeeded by a valid purchase, the conduct or representations relied upon must show such an intention. The presence of such an intention depends on the facts and circumstances of each case. One of the factors to be considered is the effect of the transfer upon creditors of the predecessor corporation. Admissions of liability on the part of officers or other spokesmen of the successor corporation are also considered in determining whether implied liability exists. However, the mere fact that the new corporation has voluntarily paid some of the debts of the old corporation is no ground for inferring that it assumed the latter's debts . . .

*Long v. Home Health Servs. of Puget Sound, Inc.,* 43 Wn. App. 729, 734, 719 P.2d 176, *review denied,* 106 Wn.2d 1012 (1986), quoting 15 W. Fletcher, *Private Corporations* § 7124 (1983).

Uni–Com extensively discusses *Northwest Perfection Tire Co. v. Perfection Tire Corp.,* 125 Wash. 84, 215 P. 360 (1923). There, a creditor corporation had so completely taken over an insolvent debtor corporation that the creditor corporation had absorbed the debtor corporation and continued its business. The court held the creditor corporation had impliedly assumed all the insolvent debtor's obligations. First, we believe the *Northwest Perfection Tire Co.* holding is not based upon an implied agreement, but rather upon continuation, the third exception listed in *Martin v. Abbott Laboratories, supra.* Second, nothing in the *North-*

*west Perfection Tire Co.* opinion indicates the creditor there acted pursuant to a perfected security interest, as did MPC.

Likewise, neither *Zander v. Larsen,* 41 Wn.2d 503, 250 P.2d 531 (1952) nor *Long v. Home Health Servs. of Puget Sound, Inc., supra,* also cited by Uni–Com, concerns a secured creditor acting to protect its interests. The trial court correctly determined there was no implied agreement to pay the Uni–Com debt.

The second exception, a de facto consolidation or merger, takes place when two or more corporations are joined such as to result in the absorption of one by the other, or the creation of a new corporation. *Cashar v. Redford,* 28 Wn. App. 394, 624 P.2d 194 (1981). It only occurs when the consideration flowing to the selling corporation is shares of the purchasing corporation's stock, as opposed to cash. The theory behind the requirement of a stock transfer is that the shareholders of the seller corporation retain an interest in the business transferred. *Cashar v. Redford, supra.* Here, no shares changed hands. Rather, Argus Publishing Company received the equivalent of cash in the form of forgiveness of its debt. That Murray personally retained an ownership interest in the "Argus Weekend" after the transfer, through his preexisting shares of MPC, is not a stock transfer within the meaning of a de facto merger or consolidation.

Uni–Com cites *Knapp v. North Am. Rockwell Corp.,* 506 F.2d 361 (3d Cir. 1974), *cert. denied,* 421 U.S. 965, 44 L. Ed. 2d 452, 95 S. Ct. 1955 (1975), which involved the merger exception in the context of a products liability case. In *Martin v. Abbott Laboratories, supra,* the Washington Supreme Court specifically recognized there are compelling reasons for imposing successor liability in a tort context which are not present in a commercial context.

Other cases cited by Uni–Com in support of its merger theory are likewise distinguishable. In *Lumbard v. Maglia, Inc.,* 621 F. Supp. 1529 (S.D.N.Y. 1985), the assets from the

debtor corporation were transferred to the new entity for little or no consideration, and elements of fraud were present. Here, there was no proof of fraud and sufficient consideration did pass from MPC to Argus, *i.e.,* forgiveness of a bona fide $1.2 million debt in exchange for assets valued at approximately $200,000.

The appellants in *Culinary Workers, Local 596 v. Gateway Cafe, Inc.,* 91 Wn.2d 353, 588 P.2d 1334 (1979) had sold a business but received it back after the purchaser's default. The appellants claimed they were "mere creditors," and as such were not liable for the purchaser's obligation to respondents. *Gateway,* at 364. The court held otherwise, emphasizing that the stock purchase agreement did not grant appellants a security interest, but rather the right to enter and take possession of the corporate property and terminate the purchase. Thus the appellants reassumed their prior status as corporate owners, not creditors. The court imposed liability on theories of corporate disregard and breach of a settlement agreement, not, as Uni–Com contends, because appellants were creditors of the purchaser. Here, on the other hand, MPC was a secured creditor of Argus Publishing Company.

*Economy Ref. & Serv. Co. v. Royal Nat'l Bank,* 20 Cal. App. 3d 434, 97 Cal. Rptr. 706, 49 A.L.R.3d 872 (1971) is also distinguishable. There, secured creditors of the debtor corporation purported to take a deed in lieu of foreclosure of the debtor's real property interest and assignments to satisfy a chattel mortgage. The court held the transfers were without consideration because the underlying notes were not canceled. The court also found actual intent to defraud other creditors. The court was particularly concerned with the creditor's violation of California's law against strict foreclosure of real property security. Here, however, Argus Publishing Company's debt to MPC was canceled by the transfer of assets; the transfer was accomplished under the Uniform Commercial Code; and the transfer was for adequate consideration.

We hold the trial court correctly determined MPC is not liable under the theory of de facto merger or consolidation.

A key element of the third exception, continuation, is insufficient consideration running to the seller from the purchaser corporation. *Long v. Home Health Servs. of Puget Sound, Inc., supra; Cashar v. Redford, supra.* We have already stated the transfer here was for adequate consideration.

Uni–Com relies upon *Northwest Perfection Tire Co.,* wherein the only consideration passing to the seller corporation was forgiveness of whatever preexisting indebtedness it had to the purchaser. In exchange, the purchaser acquired all the assets of the seller corporation, which was either insolvent or in imminent danger of insolvency. The court imposed liability without addressing adequacy of consideration. Modernly, however, Washington courts have emphasized the necessity of a finding of inadequate consideration as a prerequisite for imposition of successor liability based upon a continuation theory. *See Cashar v. Redford, supra; Long v. Home Health Servs. of Puget Sound, Inc., supra.* Furthermore, *Northwest Perfection Tire Co.* did not involve foreclosure of a perfected security interest under the Uniform Commercial Code.

Uni–Com also cites several cases from other jurisdictions in support of its continuation theory. However, none of them involve a creditor taking over an insolvent debtor to collect a bona fide debt pursuant to a valid, perfected security interest. Nor do they involve a creditor such as MPC who has substantial business interests in addition to those of the business assumed. *See Bishop v. Dura–Lite Mfg. Co.,* 489 F.2d 710 (6th Cir. 1973) (new corporation formed specifically to take over debtor corporation in order that debtor corporation could escape liability); *Brockmann v. O'Neill,* 565 S.W.2d 796 (Mo. Ct. App. 1978) (new corpor-

ation formed after debtor corporation ceased doing business; new corporation completely took over all contracts of the seller, using the same work force, supervisors, trucks, tools and equipment); *National Carloading Corp. v. Astro Van Lines, Inc.*, 593 F.2d 559 (4th Cir. 1979) (transfer for inadequate consideration).

The fourth exception, fraudulent purpose, is raised for the first time in Uni–Com's reply brief. We therefore need not address the issue. *Dickson v. United States Fid. & Guar. Co.*, 77 Wn.2d 785, 787–88, 466 P.2d 515 (1970); RAP 10.3(c) (reply brief limited to a response to issues in brief to which reply directed). Furthermore, Uni–Com's counsel conceded at oral argument that a fraudulent conveyance theory was not argued to the trial court. This court need not consider issues raised for the first time on appeal. RAP 2.5(a). We consider this issue abandoned.

We believe that to impose successor liability would be to award Uni–Com that which its predecessor specifically sought but failed to obtain in its negotiations for the sale of TMC Publications, Inc.: security for Argus Publishing Company's promissory note. Furthermore, when MPC took over Argus Publishing Company's assets, it acted pursuant to a valid, perfected security interest under the Uniform Commercial Code and gave Argus Publishing Company adequate consideration. The doctrine of successor liability is equitable in nature and was not intended to impose the burden of paying unsecured debts upon a secured creditor.[2]

---

[2]This action was commenced more than 4 months before MPC perfected its security interest in Argus Publishing Company's accounts receivable. Then more than a year passed before MPC foreclosed that interest. However, nothing in the record indicates Uni–Com acted to avail itself of prejudgment attachment after this litigation commenced. *See* RCW 7.12.010; *Rogoski v. Hammond*, 9 Wn. App. 500, 513 P.2d 285 (1973).

## CONCLUSION

The judgment against MPC is reversed. The judgments are affirmed in all other respects.

SWANSON, J., and KRISTIANSON, J. Pro Tem., concur.

Review denied by Supreme Court September 1, 1987.