FLETCHER, Circuit Judge:
The trustee for debtor American Alloy Metals (“AAM”) appeals the district court’s affirmance of the bankruptcy court’s decision in an adversary proceeding brought by the trustee against Walter Kilimnik, former president of AAM. The decision in most respects favored Kilimnik. Kilimnik cross appeals that portion of the judgment that disfavored him. We reverse in most respects and remand.
FACTS
Walter Kilimnik founded AAM in 1965. He moved the company from California to Vancouver, Washington in 1980.
In 1982, Kilimnik, AAM’s president and sole shareholder, sold the assets of AAM to a corporation owned by Peter Suriano, AAM’s general manager. The transaction was structured as a leveraged buy-out. Ki-limnik changed the name of AAM to WNK Enterprises, Inc. (“WNK”), while Suriano set up a new corporation called AAM. The new AAM purchased the assets of WNK. Suriano and AAM arranged to pay the purchase price as follows: Suriano made a down payment of $50,000, (the new) AAM assumed $385,000 of WNK’s trade pay-ables, and Suriano and AAM executed a promissory note in favor of Kilimnik for $3.95 million. The nature of the collateral securing the balance of the purchase price is one of the key issues. On May 1, 1982, the parties executed an agreement for the sale of the assets of WNK (“Purchase Agreement”) to AAM and Suriano. After the sale, however, Kilimnik was president of AAM, and Suriano was general manager, positions each had held in the first AAM.
Kilimnik was to receive periodic payments on the note, but payments ceased almost immediately. No payments were made between September 1982 and August 1985 (when a preferential payment was made to Kilimnik).
In the spring of 1985, Suriano and Kilim-nik apparently had a falling out. After negotiation, Suriano agreed to leave the corporation. As part of the settlement, he gave Kilimnik an irrevocable proxy to vote all his stock in the corporation. AAM paid Suriano an amount roughly equivalent to his 1982 down payment, and Suriano was released from personal liability on the promissory note.
Kilimnik was in sole control of AAM as president and holder of an irrevocable proxy to vote the shares. Apparently, under his direction, AAM’s business began to improve. However, it had some problems with slow pay to its trade creditors, and Kilimnik found it necessary to reassure some of them. In early July 1985, Kilimnik had a heart attack, and was hospitalized for about two weeks. At the end of July, Kilimnik leased a small office in a location a short distance from AAM.
In August 1985, AAM made a $75,000 payment on the note to Kilimnik, and also redeemed $2,000 of preferred stock he held. *953 On August 29, 1985, Kilimnik gave AAM notice of his intention to declare default on the note on September 9, 1985. On September 13, 1985, Kilimnik filed suit in the Washington state court to enforce his security interest. During this period, AAM placed unusually large orders with several of its suppliers. The bankruptcy court found substantial payments were also made to creditors at this time, although creditors continued to press AAM for payment and even threatened legal action.
In September 1985, Kilimnik incorporated AAM Aerospace and Corrosion International, Inc. (“Aerospace”)-[1] Kilimnik began a transition of AAM’s business to Aerospace. Aerospace took over AAM’s facilities, and all AAM’s employees became Aerospace employees. AAM’s phone lines were moved to the small office that had been rented in July. A temporary employee was hired to answer the phone; she would take messages from AAM customers and deliver them to what was now Aerospace. Aerospace would then take the customer orders.
On September 30, 1985, Kilimnik informed AAM of his resignation as president and chairman of the board of directors, effective October 1, 1985. On October 1, a special meeting of AAM shareholders was held. A resolution was adopted directing AAM to waive its rights in its inventory, equipment and receivables and surrender them to Kilimnik, in exchange for Kilimnik’s agreement to forego a deficiency judgment against AAM. AAM’s assets were then turned over to Kilimnik. On October 2, 1985, Kilimnik withdrew $104,600 from an AAM deposit account.
On October 11, 1985, an involuntary chapter 7 petition was filed against AAM by certain of its creditors. In January 1986, the bankruptcy court approved the appointment of Joseph E. Shickich, Jr. as special counsel to the trustee for AAM; Shickich was employed for the purpose of bringing an adversary action against Kilim-nik. In February 1986, the trustee instituted the proceeding against Kilimnik, seeking, among other things, to recover the value of AAM’s assets surrendered to Ki-limnik, to subject Kilimnik’s claim to equitable subordination, and to impose successor liability on Aerospace.
The parties filed cross-motions for summary judgment on the issue of Kilimnik’s security interest in AAM’s assets. In May 1987, the bankruptcy court granted summary judgment in favor of Kilimnik.
In September 1988, the remaining issues were tried. The bankruptcy court found that the August 1985 payments to Kilimnik were preferential, but dismissed the trustee’s remaining claims. The trustee appealed to the district court, which, without discussion, affirmed the bankruptcy court’s decision in its entirety in September 1990. The trustee now appeals, and Kilimnik cross-appeals.
I
The trustee seeks recovery of the equipment, inventory and accounts receivable seized by Kilimnik in foreclosure of his claim. The trustee also seeks to recover the $104,631.79 that Kilimnik caused the debtor to withdraw from its Liquid Assets Management Account (“LAMA”) and pay to himself on October 2, 1985, and the value of several motor vehicles Kilimnik transferred to himself.
On the parties’ cross-motions for summary judgment, the bankruptcy court held that, at the time he foreclosed, Kilimnik had a valid, perfected security interest “in all inventories, deferred charges, machinery, equipment, automobiles, office furniture and equipment and accounts receivable” of AAM. Later, after trial, the court held that the LAMA was also subject to Kilimnik’s security interest, because “the LAMA account was related to the Debtor’s accounts receivable and such receivables were subject to the Kilimnik’s [sic] security *954 interest.” The trustee appeals these rulings.
Interpretation of a contract is an issue of law reviewed de novo. Taylor-Edwards Warehouse v. Burlington Northern, 715 F.2d 1330, 1333 (9th Cir.1983) (applying Washington law). “Under Washington law, the role of the court in a contract action ‘is to ascertain the parties’ intentions and give effect to their intentions.’ ” Id. at 1334 (quoting In re estate of Hollingsworth, 88 Wash.2d 322, 560 P.2d 348, 350-51 (1977)). Extrinsic evidence is admissible as to the entire circumstances under which the contract was made as an aid in ascertaining the parties’ intent. Berg v. Hudesman, 115 Wash.2d 657, 801 P.2d 222, 229 (1990).
Three paragraphs of the purchase agreement are relevant. Paragraph 1 describes the property sold. Paragraph 8 is captioned “Security Agreement and Collateral” and provides, in relevant part:
To the extent Buyer creates accounts receivable from sales made subsequent to closing date, Buyer agrees to allow the accounts receivable as collateral for the payments which are due or to become due under the terms of the promissory note delivered to Seller as part of the purchase price. Buyer also allows his stock certificate in American Alloy Metals, Inc. to be given as collateral for the note. Buyer and Seller agree to' the terms of the Working Capital Financial Agreement attached hereto and made a part hereof, designated as Exhibit “H”.
Paragraph 25, captioned “UCC-1 For Sale,” provides for the buyer to “execute a Form UCC-1 and to initial such additional sheets as may be required to describe the items of personal property being purchased hereunder.”
In reaching its decision that Kilimnik had a security interest in AAM’s equipment and inventory, the bankruptcy court relied only on the plain language of the Purchase Agreement: “[T]he purchase and sale agreement, when read as a whole, contains a security agreement that described adequately the collateral that is the subject of this dispute.” The bankruptcy court reasoned that paragraph 25 indicated that the seller was to retain a security interest in the property transferred, while paragraph 8 provided for additional collateral for the credit extended. On appeal, the trustee apparently does not contest that Kilimnik had a security interest in the equipment and inventory transferred at the time of the purchase agreement.
Nonetheless, a reading of the Purchase Agreement alone does not support a holding that Kilimnik had a secured interest in equipment and inventory acquired after May 1, 1982. Indeed, the bankruptcy court does not explicitly discuss this issue in its memorandum decision, although in its order it provides that Kilimnik had “a valid security interest in all” equipment, inventory and other personal property. The Purchase Agreement makes no reference to “after-acquired” equipment or inventory, although it does use “after-acquired” language with respect to accounts receivable.
However, Paragraph 8 states that the Purchase Agreement incorporates the terms of the Working Capital Financial Agreement. That Agreement provides for AAM to grant to Kilimnik a security interest, as set forth in a security agreement appended to it (“Working Capital Security Agreement”). The Working Capital Security Agreement gives Kilimnik a security interest “[i]n all of Debtor’s inventory ... either now or hereafter acquired.” Thus, through the incorporation set out in Paragraph 8, Kilimnik would have a security interest in inventory acquired by AAM after May 1, 1982 to the extent it secured working capital advanced by Kilimnik and outstanding at the time of foreclosure. The advance of any such amounts is not reflected in the bankruptcy court’s findings.
Kilimnik, however, argues that, where a creditor acquires a security interest in equipment and inventory, the court should find that this interest automatically extends to after-acquired inventory and equipment. There is substantial support for the proposition that, where a financing statement or security agreement provides *955 for a security interest in “all inventory” (or uses similar broad language), the document incorporates after-acquired inventory. The rationale is that inventory is constantly turning over, and no creditor could reasonably agree to be secured by an asset that would vanish in a short time in the normal course of business. See, e.g., American Employers Ins. Co. v. American Sec. Bank, 747 F.2d 1493, 1501 (D.C.Cir.1984); National Bank v. West Tex. Wholesale Supply Co. (In re McBee), 714 F.2d 1316, 1331 (5th Cir.1983) (applying Texas law); In re Nickerson & Nickerson, Inc., 329 F.Supp. 93, 96 (D.Neb.), aff'd, 452 F.2d 56 (8th Cir.1971); In re Fibre Glass Boat Corp., 324 F.Supp. 1054, 1056 (S.D.Fla.), aff'd, 448 F.2d 781 (5th Cir.1971); In re Kelton Motors, Inc., 117 B.R. 87, 90-91 (Bankr.D.Vt.1990) (financing statement; applying Vermont law) rev’d on other grounds, 135 B.R. 758 (D.Vt.1991); In re American Family Marketing Corp., 92 B.R. 952, 954 (Bankr.M.D.Fla.1988) (financing statement; applying Florida law); Sims Office Supply v. KA-D-KA, Inc. (In re Sims Office Supply), 83 B.R. 69 (Bankr.M.D.Fla.1988) (security agreement) (“a provision for after-acquired property is to be automatically presumed unless there is some indication that the parties intended a different result”). The position that no express language is required is described as the “majority” view, American Family Marketing, 92 B.R. at 953, or the “modern trend.” Sims Office Supply, 83 B.R. at 72. There is, however, contrary authority, which reasons that “the [UCC] contemplates that a security agreement should clearly spell out any claims to after acquired collateral.” Covey v. First Nat’l Bank (In re Balcain Equip. Co., Inc.), 80 B.R. 461, 462 (Bankr.C.D.Ill.1987); see also In re Middle Atl. Stud Welding Co., 503 F.2d 1133, 1135 (3d Cir.1974).
No Washington or Ninth Circuit cases appear to be directly on point. The trustee cites DuBay v. Williams, 417 F.2d 1277, 1285 (9th Cir.1969), as holding that express language is required to create an interest in after-acquired property. However, that case does not go quite so far. At issue in DuBay was the creditor’s security interest in certain accounts receivable. The security agreement provided for the creditor to select, at given times, accounts to serve as security for his loan. The creditor argued that the designation of these accounts created a security interest “not only in respect of their then stated balances, but also of the future balances of those accounts” which were not later released from the security agreement. The court rejected this argument: “The contention fails because those instruments do not contain any words which import an intention to give a security interest in after-acquired property and the language used is not consistent with such an intent.” 417 F.2d at 1285. The court added, “The parties intended any future accounts and balances to be added by later assignments; there was no intent presently to assign future balances in those accounts. It is obvious that the parties did not draft the agreement and the assignment with the provisions of the Commercial Code in mind.” Id. In DuBay, then, the court found that the parties’ agreement contemplated an arrangement very different from the usual Article 9 agreement. We do not read the case as establishing the requirements for an Article 9 security agreement or financing statement.[2]
We conclude that we need not decide whether to adopt the “majority” view in this case since the Purchase Agreement does not contain the usual language granting a security interest in “all inventory” or “inventory,” but only in the items specifi *956 cally described in paragraph 1 as “inventory ... on hand at May 1, 1982.”
In addition, the rationale of the “automatic” security interest cases does not apply to after-acquired equipment. Those cases discuss cyclically depleted and replenished assets such as inventory or accounts receivable. Unlike inventory, equipment is not normally subject to frequent turnover.[3]
We are aware that the financing statement mentions after-acquired equipment, suggesting that the parties intended Kilim-nik’s security interest would extend this far. Yet we must look to the entire circumstances under which the purchase agreement was made to ascertain its meaning. See Berg, 801 P.2d at 229. Under Washington law, a contract is interpreted by reference to many contextual factors, including the subject matter of the transaction, the subsequent conduct of the parties and the reasonableness of their interpretations. See id.
The trustee here advances the more reasonable interpretation: Kilimnik took a kind of “purchase money” interest in the equipment he sold to AAM, but he did not get the additional security of a blanket interest in all equipment the company ever acquired after the sale. The subject matter of the transaction also supports this conclusion.
Kilimnik would not have had a clear reason to want after-acquired equipment covered by the purchase agreement. As we have seen, equipment, unlike inventory, is not normally subject to frequent turnover. Even if limited to the equipment on hand at the time of the sale, his interest would have been secure.
In summary, we conclude that Kilimnik’s security interest was limited to equipment and inventory owned by AAM on May 1, 1982 except to the extent that after-acquired inventory secured outstanding working capital advances made under the working capital security agreement. This conclusion necessitates a remand to the bankruptcy court for determination of the value of the improperly seized collateral, and for further findings on whether Kilim-nik received a preference. See 11 U.S.C. § 547 (trustee can “avoid” (recover for the bankruptcy estate) any “preferential” transfer of the debtor’s property, made to satisfy an antecedent debt, while the debt- or was insolvent, within 90 days before the filing of a bankruptcy petition, and which allows the creditor to receive more than it would otherwise receive under the debtor’s liquidation or reorganization plan).
II
On October 11, 1985, after AAM filed its bankruptcy petition, Kilimnik transferred three of AAM’s motor vehicles into his own name, although he was not the registered or legal owner of any of them. The trustee contended the vehicles were property of the estate and should be returned, under 11 U.S.C. § 542 (turnover of property to the estate).
The bankruptcy court held that Kilimnik held a perfected security interest in the vehicles pursuant to the Purchase Agreement and the October 6, 1982 UCC-1.
The bankruptcy court erred. Under Washington law, a security interest in a motor vehicle is perfected by notation of the secured party’s name on the vehicle’s certificate of ownership, not by filing a UCC-1. Wash.Rev.Code § 46.12.095.
Kilimnik does not seriously contest this point, but rather contends the trustee failed to prove that seizure of the vehicles was a preferential transfer and that “these old fuel-inefficient vehicles had a market value in excess of the costs of seizing and selling them.” Kilimnik is correct that, in determining whether gaining title of the vehicles constituted a preferential transfer to him, the court must “focus on value in the hands of the creditor.” Smith v. Asso- *957 dates Commerdal Corp. (In re Clark Pipe and Supply Co., Inc.), 893 F.2d 693, 698 (5th Cir.1990). However, here Kilimnik did not realize value from the vehicles by selling them and applying the proceeds to reduce his debt, but rather by putting them into use at Aerospace. Thus, liquidation costs should not be deducted from the market value.
In any case, the trustee seeks recovery not on the theory that the transfer was preferential, but rather on the theory that Kilimnik’s action was illegal because he had no legal right to the vehicles. See Sherwood v. Bellevue Dodge, Inc., 35 Wash.App. 741, 669 P.2d 1258, 1262 (1983) (where creditor does not have a perfected security interest or contractual right to foreclose, nonjudicial repossession of vehicle constitutes “unlawful conversion”). Thus, on remand Kilimnik should be ordered to pay to the estate the market value of the vehicles at the time of transfer, plus interest.
Ill
Generally, bank accounts are outside the scope of Article 9 of the UCC. Wash.Rev.Code § 62A.9-104(Z) (Article 9 does not cover “any deposit account”). However, a creditor’s security interest may extend to any or all funds in a deposit account where the funds are “proceeds” of collateral covered by a security interest. Wash.Rev.Code § 62A.9-306. Section 9-306(4) determines the extent of the security interest where the borrower has filed for bankruptcy; it provides, in relevant part:
In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:
(a) in identifiable non-cash proceeds and in separate deposit accounts containing only proceeds
[ ••• ]
(d) in all cash and deposit accounts of the debtor in which proceeds have been commingled with other funds, but the perfected security interest under this paragraph (d) is:
[ ... ]
limited to an amount not greater than the amount of any cash proceeds received by the debtor within ten days before the institution of the insolvency proceedings less the sum of (I) the payments to the secured party on account of cash proceeds received by the debtor during such period and (II) the cash proceeds received by the debtor during such period to which the secured party is entitled under paragraphs (a) through (c) of this subsection (4).
Wash.Rev.Code § 62A.9-306(4).
Before the bankruptcy court, Kilimnik testified that the LAMA was “related to accounts receivable” and “related to the UCC filing as my security.” However, apparently he submitted no documentary evidence, nor did he provide further testimony, as to the source of the funds in the LAMA. We conclude as a matter of law that this evidence was inadequate to establish Kilimnik’s right to the funds in the account.
This court has held that the creditor bears the burden of establishing that a deposit account contains proceeds of collateral covered by a security interest.
The creditor’s security interest in the whole account under Section 9-306(4) is prima facie valid, except as to the trustee, and, as to him, the creditor’s security interest is presumptively preferential. The creditor can rebut the presumption by appropriately tracing his proceeds. We think that it is fair to place the burden on the creditor to identify his own proceeds and thus to defeat, in whole or in part, the trustee’s claim of preference.
Arizona Wholesale Supply Co. v. Itule (In re Gibson Products), 543 F.2d 652 (9th Cir.1976), cert. denied, 430 U.S. 946, 97 S.Ct. 1583, 51 L.Ed.2d 794 (1977); see also Maxl Sales Co. v. Critiques, Inc., 796 F.2d 1293, 1301 (10th Cir.1986) (creditor who failed to present evidence on amount of proceeds received by debtor could not establish right to funds in account); United *958 States v. Barsotti Bros. Bakery, 80 B.R. 745, 749 (Bankr.W.D.Pa.1987) (dismissing claim of creditor who failed to meet burden of proving account contained only proceeds); Charter First Mortgage v. Oregon Bank (In re Charter First Mortgage), 56 B.R. 838, 850 (Bankr.D.Ore.1985) (creditor failed to show debtor received proceeds during 10-day period preceding filing).
Courts have generally required the creditor to submit detailed documentary evidence or testimony proving that an account contained only proceeds, or establishing the amount of proceeds the debtor received in the ten days preceding the bankruptcy filing. For example, in In re Mark Twain Marine Indus., Inc., 115 B.R. 948, 953 (Bankr.N.D.Ill.1990), the court held that a creditor had failed to meet its burden. Although the debtor had submitted the bank statement of the account at issue, the creditor did not provide “any evidence of what any of the remittances [deposited into the account] were for.” The court refused to “speculate” that the deposits were proceeds of the creditor’s collateral.
Here, Kilimnik merely testified that the LAMA was “related to” his security interest. He did not even state that the LAMA contained only proceeds (to establish his rights under section 9-306(4)(a)), nor did he state that, in the ten days preceding its filing, AAM had received proceeds in at least the amount he withdrew (to establish his rights under section 9-306(4)(d)). Moreover, cases suggest that mere “self-serving” testimony such as Kilimnik’s is inadequate. Barsotti Bros. Bakery, 80 B.R. at 748. Section 9-306 “require[s] the creditor to bird-dog his proceeds or pay the consequences.” Charter First Mortgage, 56 B.R. at 851. Because he controlled AAM, Kilimnik could easily have instituted proper procedures to keep track of the proceeds of his collateral; moreover, he would be aware of the type of documentation available at AAM to substantiate his claim before the court.
Kilimnik argues that the trustee has submitted no evidence to controvert Kilimnik's “evidence.” However, at issue here is whether Kilimnik has met his initial burden of rebutting the presumption against him. He has not done so. We reverse the bankruptcy court on this issue and direct that on remand Kilimnik be ordered to pay to the trustee the amount taken from the LAMA, plus interest from the date of taking.
IV
The trustee asked the court equitably to subordinate Kilimnik’s claims to those of the other creditors. The bankruptcy court declined to do so.
The bankruptcy court’s decision on the issue of equitable subordination is reviewed for abuse of discretion. Spacek v. Thomen (In re Universal Fanning Indus.), 873 F.2d 1334, 1337 (9th Cir.1989). “Equitable subordination requires that: (1) the claimant who is to be subordinated has engaged in inequitable conduct; (2) the misconduct results in injury to competing claimants or an unfair advantage to the claimant to be subordinated; and (3) subordination is not inconsistent with bankruptcy law.” Id.; see also Christian Ctr. Life Litig. Defense Comm. v. Silva (In re Christian Life Center), 821 F.2d 1370, 1376 (9th Cir.1987) (“The bankruptcy court may subordinate a claim if it finds the claimant engaged in fraud, unfairness or inequity and the claimant’s conduct harmed the debtor or its other creditors.”) When the trustee seeks to subordinate the claim of a creditor the trustee must present evidence of the creditor’s unfair conduct. If the trustee meets this burden, “the claimant then must prove the fairness of his transactions with the debtor or his claim will be subordinated.” Estes v. N & D Properties, Inc. (In re N & D Properties), 799 F.2d 726, 731 (11th Cir.1986); see also Christian Life Ctr., 821 F.2d at 1377.
In support of its decision not to subordinate Kilimnik’s claims, the bankruptcy court stated:
On this record, it would appear to me that where a secured creditor properly foreclosed a security agreement, that no duty to other creditors and/or to the corporation to continue it in existence as *959 a going business remained. Even if there was a technical breach by Mr. Ki-limnik in that he controlled both American Alloy Metals and ACI [Aerospace], or that he intended to set up ACI after the foreclosure, there was no damage to the creditors as a whole.
Certainly there was benefit, on this record, to Mr. Kilimnik by his actions, in that he had the benefit of essentially putting in ACI as a going corporation; but I find no corresponding detriment or injury to the creditors as a whole.
ER at 285-86. The bankruptcy court issued this ruling orally; it did not revisit the issue in the conclusions of law it later propounded.
The bankruptcy court apparently concluded that neither the first nor the second factor necessary for equitable subordination was present: Kilimnik had not acted inequitably; nor was there any harm to creditors. On appeal, the trustee contends that both requirements were met.
A. Inequitable conduct
The bankruptcy court’s ruling suggests it concluded that because he was merely a secured creditor, Kilimnik owed no fiduciary duty to the other creditors and thus cannot be found to have acted inequitably. It is difficult to square this analysis with precedent on the issue of equitable subordination.
Case law suggests that whether or not Kilimnik’s claim was secured is irrelevant to this issue. See, e.g., Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.), 926 F.2d 1458 (5th Cir.1991) (subordinating secured claim). Rather, the equitable subordination inquiry focuses on the conduct of the claimant at issue, and the nature of its relationship to the debtor.
Under the bankruptcy code, Kilimnik was an insider of the debtor. The bankruptcy court found, “In May of 1985, Mr. Kilimnik came back into control of [AAM]; and from that date until the involuntary bankruptcy petition, he did control the corporation, either as president, a member of the board of directors, or the controlling shareholder.” The record suggests that the finding should have gone further: Mr. Kilimnik never relinquished operating control. He was president of AAM from the moment it acquired the assets from WNK. A “person in control of the debtor” is an “insider” of the debtor. 11 U.S.C. § 101(31). Where the trustee seeks to subordinate “a claim arising from the dealings between a debtor and an insider,” the court will give the insider’s actions rigorous scrutiny. Fabricators, 926 F.2d at 1465. Moreover, Kilimnik had a fiduciary duty to AAM. See Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939) (“dominant or controlling stockholder” is a fiduciary); Washington v. Keypoint Oyster Co., 64 Wash.2d 375, 391 P.2d 979, 983 (1964) (corporate officers and directors have a fiduciary relation to the corporation). The “standard of fiduciary obligation is designed for the protection of the entire community of interests in the corporation — creditors as well as stockholders.” Pepper, 308 U.S. at 307, 60 S.Ct. at 245 (footnote omitted).
Here, the bankruptcy court’s own findings suggest Kilimnik’s actions could not withstand this rigorous scrutiny. As a secured creditor whose loan was in default, Kilimnik was entitled to foreclose, but, as president, controlling shareholder and director, he participated in the vote by AAM’s board to waive its rights in the collateral. Admittedly AAM was thereby released from liability for the amount by which Kilimnik’s claim exceeded the value of the collateral, but that does not cure the problem. The court expressly found that “[i]n foreclosing on his note, opening AAM Aerospace & Corrosion International and having Debtor renounce its interest in collateral, Kilimnik intended, if possible, to place his own interest, which he believed to be secured, ahead of the interests of Debt- or’s creditors.”
In addition, Kilimnik’s other actions in the months preceding foreclosure demonstrate that he placed his own interests before those of AAM, and acted to the detriment of other'creditors. The bankruptcy court found that, by September 1985, Ki- *960 limnik “had determined to start a new corporation which would compete directly with [AAM], if it continued to exist.” The court also made findings that suggest that for some time Kilimnik operated AAM in such a way as to prepare for Aerospace to take over its business (he rented separate additional office space at the end of July 1985). The bankruptcy court found that there was evidence to suggest that Kilimnik had not purposely increased inventories or built up trade debt before he foreclosed on the AAM assets; however, the court also noted that AAM, while under Kilimnik's control, had made somewhat larger purchases from its suppliers, and that Kilimnik had made assurances to AAM’s suppliers to persuade them to continue to do business with AAM. Cf. Fabricators, 926 F.2d at 1467 (insider creditor acted inequitably when it induced other creditors to extend credit to debtor, where insider knew debtor was in financial trouble).
B. Injury to competing claimants
The bankruptcy court found that Kilim-nik’s conduct had caused “no damage to the creditors as a whole.”[4] It apparently reached the conclusion that there had been no damage because it had determined that Kilimnik, as a secured creditor, was entitled to foreclose. Because his claim had priority over the unsecured claims of the suppliers, his actions did not damage them. Moreover, the court found that AAM had made substantial payments to creditors in the months preceding Kilimnik’s foreclosure and AAM’s filing of a chapter 11 claim.
We conclude the bankruptcy court erroneously focused on the harm to “creditors as a whole.” The proper inquiry was whether Kilimnik’s self-dealing resulted in “injury to competing claimants or an unfair advantage” to Kilimnik himself. A claim will be subordinated only to the claims of creditors whom the inequitable conduct has disadvantaged. Fabricators, 926 F.2d at 1470; N & D Properties, 799 F.2d at 733. Thus, the bankruptcy court should have looked at the harm to each of the relevant creditors to determine whether Kilimnik’s claim should be subordinated to their claims and, if so, to what extent. The bankruptcy court’s findings here suggest that Kilimnik’s conduct may have injured several trade creditors. After Kilimnik was in complete control of AAM, AAM made larger than normal purchases from certain suppliers; this suggests Kilimnik was building up inventory in preparation for foreclosure. In addition, the court’s findings suggest that reassurances by Kilimnik induced Cabot Corporation to continue supplying AAM and to postpone efforts to collect on past due debt.[5]
C. Conclusion
We reverse the bankruptcy court’s holding that Kilimnik’s claim should not be equitably subordinated. We conclude that all three requirements for equitable subordination have been met, and that Kilimnik’s claim should be subordinated to the claims of any named creditors.[6] On remand, the *961 bankruptcy court must determine to which claims Kilimnik’s claim should be subordinated, and to what extent.
V
The trustee also contends that Aerospace was liable for the debts of AAM as a “successor corporation.” The bankruptcy court held that Aerospace was not subject to successor liability.
The Washington Supreme Court set out the principles of successor liability in Martin v. Abbott Laboratories, 102 Wash.2d 581, 689 P.2d 368 (1984):
Traditionally, a corporation purchasing the assets of another corporation does not, by reason of the purchase of assets, become liable for the debts and liabilities of the selling corporation. The courts have recognized, however, that the traditional rule allows a transferring corporation, under certain circumstances, to effectively avoid its obligations to the detriment of creditors and minority shareholders. Thus, Washington has recognized four narrow exceptions to the traditional rule: (1) the purchaser expressly or impliedly agrees to assume liability; (2) the purchase is a de facto merger or consolidation; (3) the purchaser is a mere continuation of the seller; or (4) the transfer of assets is for the fraudulent purpose of escaping liability.
689 P.2d at 384.
The bankruptcy court found: “Since AAM Aerospace & Corrosion International did not purchase the Debtor’s assets from the Debtor, AAM Aerospace & Corrosion International did not become a successor corporation to the Debtor and is not subject to successor liability.”
The bankruptcy court erred in this conclusion. While the Washington Supreme Court’s formulation of the successor liability test refers to a “purchase” of assets, its discussion also suggests that other forms of “transfer” of assets may result in such liability. We conclude that the Washington court would extend liability to transfers other than straightforward purchases. Otherwise, unscrupulous businesspersons would be able to avoid successor liability and cheat creditors merely by changing the form of the transfer. Several states have explicitly included the phrase “or otherwise transfers” in their formulation of the law. See, e.g., Florom v. Elliott Mfg., 867 F.2d 570, 575 (10th Cir.1989) (Colorado law) (discussing exception to general rule of nonlia-bility of successor corporations where “predecessor sells or otherwise transfers all its assets to the successor ... ”); Wallace v. Dorsey Trailers Southeast, Inc., 849 F.2d 341, 343 (8th Cir.1988) (Missouri law) (“Where one corporation sells or otherwise transfers all of its assets to another corporation ... ”) (emphasis original; citation omitted). Fletcher’s Cyclopedia of Corporations also suggests that successor liability is not limited to transactions in which the asset transfer is accomplished through purchase. See 15 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 7122 (perm. ed. rev. vol. 1990).
The bankruptcy court should have considered whether successor liability existed on either a continuation or a fraud theory.
Kilimnik argues that Aerospace falls within the secured creditor exception to the mere continuation theory. In Uni-Com Northwest, Ltd. v. Argus Publishing Co., 47 Wash.App. 787, 737 P.2d 304, review denied, 108 Wash.2d 1032 (1987), the court noted that where a secured creditor “tak[es] over an insolvent défetor to collect a bona fide debt pursuant to a valid, perfected security interest,” there was no successor liability under the mere continuation theory. 737 P.2d at 313.
*962 However, the Uni-Com discussion of successor liability also suggests that Aerospace may nonetheless be liable. In reaching its conclusion, the Uni-Com court distinguished certain cases because in them the creditor did not have a perfected security interest. It also noted that “none of [the distinguished cases] involve a creditor such as MPC who has substantial business interests in addition to those of the business assumed.” The Uni-Com court cited, in contrast to the case before it, two cases in which successor liability had been found: Bishop v. Dura-Lite Mfg. Co., 489 F.2d 710 (6th Cir.1973), in which a new corporation was formed specifically to take over the debtor corporation in order that the debtor corporation could escape liability, and Brockmann v. O’Neill, 565 S.W.2d 796 (Mo.Ct.App.1978), in which a new corporation was formed after the debtor corporation ceased doing business, and the new corporation completely took over all contracts of the seller, using the same work force, supervisors, trucks, tools and equip ment. The facts in this case very closely resemble Bishop and Brockmann: Aerospace’s sole business interest was the operation it assumed from AAM; Aerospace took over AAM’s set up virtually without change; AAM was left with substantial liabilities and no assets. The mere fact that the transfer of assets involved foreclosure on a security interest will not insulate a successor corporation from liability where other facts point to continuation. In Allied Indus. Int’l, Inc. v. Agfa-Gevaert, Inc., 688 F.Supp. 1516 (S.D.Fla.1988), aff'd, 900 F.2d 264 (11th Cir.1990), a case the trustee cites, the court found that a new corporation set up by the president of the old corporation to avoid payment of a judgment was subject to successor liability; all the equipment the new corporation used had belonged to the old one, until the president repossessed it in foreclosure of notes from the corporation to him. The similarity to the facts here is remarkable.
In determining whether successor liability exists under the mere continuation theory, the court looks at two factors: common identity of the officers, directors and stockholders in the two companies, and sufficiency of consideration running to the seller corporation in light of the assets sold. Cashar v. Redford, 28 Wash.App. 394, 624 P.2d 194, 196 (1981). The first factor clearly is met here: Kilimnik was the controlling force in both companies. The second, however, is more complicated to analyze, as the “consideration” AAM received consisted of fulfillment of its obligation to Kilimnik through foreclosure and Kilimnik’s renunciation of a deficiency judgment. Arguably, had Kilimnik had a good security interest in everything transferred there would have been adequate consideration. Any existing good will at the time Kilimnik seized AAM’s assets also would affect the adequacy of the consideration. Kilimnik to some extent “paid” for the assets, but there was no payment for the employee base, customer relations and other intangible assets.
Because we conclude that successor liability may exist based on the fraud-to-creditors theory, at this juncture we need not decide the extent and adequacy of the consideration and the bankruptcy court may not need to do so on remand.
The circumstances of this case indicate that Kilimnik may be liable as a successor under a fraud-to-creditors theory. When Kilimnik took with him all AAM’s assets and employees, he left AAM with substantial liabilities. The bankruptcy court found that substantial payments had been made to creditors during the 90 days before the bankruptcy filing; nonetheless, sufficient claims remained to give rise to an involuntary bankruptcy petition. In addition, the bankruptcy court found that in the months just prior to Kilimnik’s foreclosure, AAM had made larger purchases than was customary from its suppliers, and had not paid for them.
We reverse the bankruptcy court’s finding that Aerospace was not a successor to AAM. On remand the bankruptcy court should address the issue again, examining whether Kilimnik is liable first under a fraud-on-the-creditors theory and then, if necessary, under the mere continuation theory.
*963 VI
As a separate matter, the trustee contends that Kilimnik owes the estate for the value of AAM’s good will which he improperly took in 1985. The bankruptcy court held that the good will, if any, of AAM ceased to exist when Kilimnik foreclosed on its tangible assets:
On the record, it would appear to me that once the tangible assets of American Alloy Metals were taken, no good will existed or remained, even assuming that any existed at any time.
The good will, under Mr. Wheeler’s testimony and the theory advanced by the trustee, was dependent on the existence of operating assets; facilities; suppliers; customer base; and management, including Mr. Kilimnik or his equivalent replacement.
When the security interest was foreclosed, the good will — again, I am assuming it existed, without so finding — ceased to exist, based solely on the taking or the imminent taking of the tangible assets.
On this record, there was not a taking of intangibles improperly by the defendant; it just ceased to exist, under Mr. Wheeler’s testimony, once the taking of those assets became imminent.
ER 283.
Washington courts have defined good will as the intangible “capital” a business builds up over time:
The good will of a going business is an element which inheres in it and cannot be separated from the whole. There are many elements, defined in the decisions of this court and other jurisdictions, which comprise good will. Among these are continuity of name, location, reputation for honesty and fair dealing, individual talents and ability of the members of the going business organization, and many others. Good will is an intangible element that inheres in the value of a going business.
In re Estate of Giant, 57 Wash.2d 309, 356 P.2d 707, 709 (1960).
The bankruptcy court heard testimony that AAM had no going concern value in the fall of 1985. Ralph Arnold testified that the business had suffered such a steep decline that “the negatives were much greater than any positives which you might find.” Rep.’s Tr. 1063. There was thus evidence to support the bankruptcy court’s finding that no good will existed.
However, there is a strong argument to be made that the bankruptcy court erred, even under the “clearly erroneous” standard of review applicable to this factual finding. First, as the Washington Supreme Court’s discussion of good will makes clear, elements of good will exist independent of a company’s tangible assets. In addition, the bankruptcy court focused only on the time at which AAM’s assets were seized; however, the code’s fraudulent transfer provisions allow recovery of any interest transferred within one year of the filing of the petition. 11 U.S.C. § 548. Moreover, the circumstances surrounding the demise of AAM suggest that Kilimnik recognized that AAM had a going concern value and took steps to misappropriate that value, even before he foreclosed on its assets. He incorporated the similarly named “AAM Aerospace,” set up an arrangement under which AAM became a mere shell and caused its customers’ inquiries to be forwarded to the new company, and “took over” AAM’s plant and employees. Thus, the bankruptcy court ignored substantial evidence that Kilimnik was attempting to take over AAM's intangible assets before he took possession of its equipment and inventory.[7]
*964 We conclude that the bankruptcy court erred in finding that AAM had no good will, and that Kilimnik did not benefit from a fraudulent transfer of that good will.
YII
Kilimnik raises several issues on cross-appeal. First he challenges the appointment of Joseph Shickich as special counsel because of a conflict of interest. The bankruptcy court approved the employment of Shickich as special counsel to the trustee to prosecute the preference actions against Kilimnik. Kilimnik contends that the bankruptcy court should have disqualified Shickich from employment by the trustee because Shickich had represented Cabot Corporation, one of the creditors that had filed the involuntary petition against AAM and a competitor of Aerospace.
Section 327 governs the trustee’s employment of professionals; it provides in relevant part:
(a) Except as otherwise provided in this section, the trustee, with the court’s approval, may employ one or more attorneys ... that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee’s duties under this title.
(c) In a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person’s employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest, (e) The trustee, with the court’s approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.
11 U.S.C. § 327.
Kilimnik contends, first, that the district court failed to make the requisite findings under 327(c). The court adopted Shickich’s proposed order of appointment; however, it changed the suggested language finding no “actual conflict of interest under Section 327(c)” to no “material conflict of interest under Section 327(c).” Thus, Kilimnik contends the court applied an incorrect legal standard, and the order of appointment should be reversed and remanded.
Section 327(c) allows the appointment of counsel to represent the trustee, even where counsel represents a creditor, where the court finds no “actual conflict of interest.” Reasoning by analogy to section 327(e), several courts have held that, where the trustee seeks to appoint counsel only as “special counsel” for a specific matter, there need only be no conflict between the trustee and counsel’s creditor client with respect to the specific matter itself. Fondiller v. Robertson (In re Fondiller), 15 B.R. 890, 892 (Bankr. 9th Cir.1981), appeal dismissed, 707 F.2d 441 (9th Cir.1983); see also Altenberg v. Schiffer (In re Sally Shops, Inc.), 50 B.R. 264, 266 (Bankr.E.D.Pa.1985) (following Fondiller). Here, with respect to the Kilimnik preference action, the interests of Cabot and the trustee coincide: if money is recovered for the estate, Cabot's pro rata recovery will ultimately be greater.
Kilimnik makes a complex argument that Cabot’s interests are adverse to the trustee. He suggests that the trustee is the fiduciary representative of all the creditors, including Kilimnik. Thus, the trustee cannot let one creditor, Cabot, “seize assets foreclosed on by Kilimnik”; moreover, the trustee cannot further an action by Cabot against Aerospace, a competitor. This argument has no merit. It is the trustee who is seeking to recover a preference from Kilimnik. Under Kilimnik’s reasoning, the trustee could never pursue an action against one of the estate’s creditors, because he would have a fiduciary obligation *965 to the creditor. In addition, the trustee has no obligation to protect Aerospace’s interests as a competitor in its field. We conclude the appointment of Shickich was proper.
Next, Kilimnik challenges the holding that the redemption of his $2000 preferred stock constituted a preferential transfer. On or about August 23, 1985, AAM paid Kilimnik $2000 for redemption of 2,000 shares of preferred stock issued to him in May 1985 for services to the corporation. The bankruptcy court found that this payment constituted a preferential transfer, and ordered Kilimnik to return the funds to the trustee. Kilimnik contends that the bankruptcy court erred, because the redemption of preferred stock was not a payment “for or on account of an antecedent debt.” See 11 U.S.C. § 547(b)(2).
The trustee relies on Consove v. Cohen (In re Roco Corp.), 15 B.R. 813 (Bankr.D.R.I.1981), aff'd in relevant part and vacated in part, 21 B.R. 429 (Bankr. 1st Cir.1982), aff'd, 701 F.2d 978 (1st Cir.1983). The relevant issue in that case, however, was whether payments made in redemption of stock constituted a fraudulent transfer. Id. at 816-17. The opinion spoke to preferential payments but only in the context of loan repayments. Id. at 817-19.
Insofar as the bankruptcy court relied on the preferential transfer theory, it is reversed. The facts here suggest that the trustee should be able to recover on the fraudulent transfer theory, however, and on remand may be able to sustain the judgment on that basis.
CONCLUSION
The judgment of the district court affirming without comment the decision of the bankruptcy court is REVERSED in most respects and the case REMANDED to the district court for remand to the bankruptcy court for further proceedings consistent with this opinion.

. In February 1986, the new corporation officially dropped the "AAM” from the beginning of its name.

. The two other Ninth Circuit cases the parties cite are also not especially helpful. The trustee views Northwest Acceptance Corp. v. Lynnwood Equip., Inc., 841 F.2d 918 (9th Cir.1988), as decisive in his favor. However, that case merely held that, where the financing statement and the security agreement differ as to the collateral covered, the security agreement defines "the extent of the security interest.” 841 F.2d at 922. That is not the issue here. Kilimnik relies on Biggins v. Southwest Bank, 490 F.2d 1304 (9th Cir.1973). At issue there was whether the description in a financing statement adequately put creditors on notice of the security holder’s interest. 490 F.2d at 1308-1309. The case also discusses the general validity of floating liens. Id. at 1309-1310.

. Kilimnik also argues that he has a security agreement in after-acquired inventory and equipment because they must be proceeds of the accounts receivable in which he has a security interest. However, Wash.Rev.Code § 62A.9-306(2) provides that a creditor’s security interest “continues in any identifiable proceeds.” Kilim-nik has not introduced evidence to identify the assets he claims as proceeds of his collateral.

. The court later clarified this ruling, stating that it was referring to "any and all creditors of [AAM] between May-October 1985” rather than to "the creditors in this bankruptcy estate." ER 255.

. Kilimnik contends that the trade creditors have suffered no injury because any harm to them "merely flowed from their status as junior unsecured creditors.” This is incorrect: at issue is whether Kilimnik’s inequitable conduct harmed the trade creditors by, for example, inducing them to ship goods to AAM when there was little likelihood they would be paid. Kilim-nik cites Spacek v. Thomen (In re Universal Farming Industries), 873 F.2d 1334, 1337 (9th Cir.1989), but that case is distinguishable. There, this court held that a creditor did not act inequitably by acquiring an admittedly valid trust deed from a third party. Another creditor contended that this act created a risk that he would not be paid. This court concluded that such a risk arose from the latter creditor's status as a junior lienholder; the trust deed holder’s misconduct, if any, did not create that risk. Here, the trustee is alleging that Kilimnik’s misconduct while an insider of AAM directly harmed the trade creditors.

.Kilimnik appears to suggest that equitable subordination would be inconsistent with the goals of bankruptcy law, because to do so would discourage corporate insiders from using their best efforts to turn around a struggling business. He cites Benjamin v. Diamond (In re Mobile Steel), 563 F.2d 692, 701 (5th Cir.1977), *961 ín which the court refused to require fiduciaries to "prove the good faith and fairness of every one of their actions with respect to their corporation” because such a burden would "discourage those most interested in a corporation from attempting to salvage it through an infusion of capital.” See abo 3 Collier on Bankruptcy § 510.05, at 510-14 (Lawrence P. King ed., 15th ed. 1993) ("lawful claims of insiders are not automatically subordinated” because “such persons are the ones most interested in restoring and reviving” the debtor). However, Kilimnik’s actions suggest that his goal was not to "revive" AAM, but rather to give Aerospace a good start.

. This case closely resembles Freehling v. Nielson (In re F & C Servs., Inc.), 44 B.R. 863 (Bankr.S.D.Fla.1984). There, the president of an insurance agency set up a new agency, to which he shifted all the accounts of the old agency, while leaving the debts of the operation with the old agency. The old agency subsequently sought bankruptcy protection. The court held that the old agency’s “book of business” had been fraudulently transferred to the new agency. 44 B.R. at 870-71. Kilimnik contends that this case is inapposite because it "involved a clearly fraudulent transfer where the debtor’s Chairman of the Board secretly operated the company to strip its assets, sequester them in another corporation, and leave the ever-increasing debts in the former corporation’s empty shell.” Respondent’s Br. 39. How *964 ever, that seems to be just what Kilimnik did here.